OPINION OF THE COURT
Meyer, J.
 Defendant’s right to counsel at a postarraignment lineup conducted in the absence of counsel was waived *48 where defendant’s counsel, having arranged with the prosecutor the physical details of the lineup and the questions to be asked and having discussed with defendant his reasons for not remaining for the actual lineup and obtained defendant’s consent, advised the prosecutor that the lineup should proceed in his absence, even though defendant did not himself communicate the waiver to the prosecutor and counsel was not in defendant’s presence when he did. While the Trial Judge was, therefore, correct in denying suppression of testimony concerning the lineup identifications, there must, nevertheless, be a reversal and a new trial because, by his persistent, excessive and unwarranted participation in the examination of witnesses, the Trial Judge denigrated defendant’s right to a fair trial.
I
The factual predicate for the jury’s finding defendant to be guilty of second degree murder may be quickly stated. On April 1, 1975, at approximately 8:00 P.M., Fong Yue Yee was shot to death on Eldridge Street in the Chinatown area of Manhattan. He had been walking with Michael Chin toward Chin’s residence when he decided to call his girlfriend. Entering a phone booth on the southeast corner of Grand and Eldridge Streets, Fong placed the call while Chin waited. Chin noticed the approach of a beige Nova, which stopped in front of the phone booth, and recognized defendant, Yut Wai Tom, in the passenger seat. Fong interrupted his call and advised Chin not to wait since the call would take some time. As Chin walked down Eldridge Street he again saw the beige Nova and defendant in the passenger seat. The car proceeded to Grand Street and turned left. Chin continued to his apartment at 81 Eldridge Street.
At this point there arrived on the scene several members of the Ortiz family, including Rosabel, who was then 12 years old, and Marivel, then 16. They noticed a biege Nova pull up in front of the phone booth and saw the man in the booth drop the phone and begin to run after looking in the direction of the car.
A gun protruded from the rear window of the car and a shot was fired at Fong, who fell to the ground. The man *49 with the gun emerged from the car, knelt down over the body, raised Fong’s chin and shot him in the throat. According to Rosabel and Marivel Ortiz, the shooter returned to the corner and looked around, looking directly at them for several seconds. He then returned to the car which sped away. Shortly thereafter Fong was pronounced dead on arrival at a nearby hospital.
The Appellate Division, one Justice dissenting, having affirmed defendant’s conviction, we must determine whether defendant was denied his right to counsel at lineup and whether he was accorded a fair trial.
II
A
The testimony presented at the Wade hearing[1] shows that the Ortiz girls each separately examined an album of photographs and selected a picture of the defendant as the shooter. Defendant was then arrested and arraigned. At arraignment on April 3, 1975, defendant’s then attorney, Joseph Stone, agreed with Assistant District Attorney Sears that a lineup would be held on Saturday, April 9, 1975 at 3:00 p.m. On April 9 Stone arrived at 2:45 P.M. and consulted with his client. Sears then informed Stone that because he had run into difficulty in obtaining Chinese standins there would be some delay. Stone announced that he had a pressing engagement and would have to leave shortly. By 3:40 the standins had been assembled and Sears dispatched detectives to pick up Rosabel and Miravel Ortiz, who lived nearby.
At 3:55, Stone asked why the lineup had not commenced and announced his departure. On inquiry Stone revealed that his “pressing engagement” was a Little League baseball game which he had to umpire because his son was a participant in the game. Sears reproached Stone, pointing out that his client was charged with a serious crime, that a prompt lineup was very important and that he would report Stone to the Appellate Division for disciplinary action if he left. Stone did leave, but returned several minutes later, apparently swayed by Sears’ threat.
*50 Stone then viewed the standing, commenting that they were generally fair. Noticing that some of them wore jackets, Stone asked that their jackets be removed since his client was without one. The request was granted. Upon request, Sears also agreed to place defendant in the number three position in the first lineup and the number five position in the second lineup. Stone examined the lineup room and the one-way mirror and obtained assurances from Sears that the two witnesses would view the lineup separately. Finally, he and Sears agreed on the wording of the question to be posed to the two witnesses.
At 4:30 p.m. Sears informed Stone that the witnesses were in his office and left the room to get them. When he returned, Stone was not there. Unable to believe that Stone had left at such a crucial stage of the proceedings, Sears searched the building for him. At 5:00 p.m. Sears decided to proceed with the lineup notwithstanding Stone’s absence, but before he was able to do so he received a telephone call in the lineup room from Stone. Stone instructed Sears to proceed with the lineup, saying that he was satisfied that the lineup would be fair. Sears offered to let Stone speak to the defendant and he did so.
The lineup was then held. Rosabel first viewed the group and stated that she thought that the killer was number three (defendant), but she was not sure. When Marivel viewed the lineup she stated that the killer was number five (again, the defendant), commenting, however, that his hair was different.
At the Wade hearing defendant, now represented by an attorney other than Stone, moved to suppress the lineup identifications on the ground that defendant had been denied his right to counsel. Having heard from the detective, the Ortiz girls and Assistant District Attorney the above stated facts concerning the lineup, the Trial Judge called Joseph Stone as the court’s witness.
Stone admitted that initially he intended to leave in order to attend the Little League game but remained because of the insistence of Sears. Further questioning by the court elicited the statement that Stone subsequently left only because he was satisfied that he had done all he could to in *51 sure a fair lineup and was convinced that Sears would run the lineup fairly and in accordance with their arrangements. Unprompted by the court was Stone’s casual remark that there was also “another reason” for his departure, which follow-up questions disclosed was that he felt that it was important that he not actually see the witnesses. Asked whether he had discussed his reason with defendant, Stone replied that he had and that defendant had agreed that his not being present would be all right.[2]
A question having been raised by Stone concerning attorney-client privilege, defendant, after conference with his new counsel, waived privilege with respect to Stone’s reason for leaving. Stone then indicated that the reason had occurred to him in part because of Sears’ insistence upon a prompt lineup, the reason for which was that in Sears’ experience Chinese defendants rarely went to trial because the witnesses were “reached”. Sears informed Stone that he intended to move with dispatch, before the Ortiz sisters were threatened or harmed.[3] It then occurred to him, Stone testified, that if he didn’t know the identity of the witnesses, about which he had been asked even before the lineup, his client could not be blamed if they were threatened or harmed.
The Judge ruled, and defendant does not now challenge the ruling, that the lineup was fair. He concluded also that defendant had knowingly and intelligently waived his right to counsel’s presence at the moment of identification and that up to that point counsel had effectively acted to insure that the lineup procedure was fair. The affirmance by the *52 Appellate Division carries with it an affirmance of the fact findings on which the hearing court’s conclusions were based.
B
There can be no dispute that defendant was effectively represented by counsel at the lineup, up to the point of Stone’s departure. Although defense counsel initially displayed an unprofessional lack of concern for his client’s welfare, the District Attorney’s threat apparently made him realize his error. Counsel then affirmatively requested a change in the dress of the standins, arranged for the placement of his client in different positions in the two lineups, discussed the wording of the question to be put to the lineup witnesses and obtained assurances that they would view the lineup separately. Finally, he advised his client to assume a pose similar to that of the standins and not to allow himself to be made conspicuous in any way. In a proceeding in which counsel’s role is essentially a passive one (see People v Settles, 46 NY2d 154, 165), Stone acted to assure that the lineup was a fair one.
Nor can we conclude that defendant was denied his right to have counsel present at the actual viewing. It is settled that a defendant is entitled to the assistance of counsel at any critical stage of the criminal proceeding and that a postarraignment lineup is such a stage (Kirby v Illinois, 406 US 682; People v Blake, 35 NY2d 331, 337). The absence of counsel at the viewing would, therefore, mandate suppression of the identifications then made unless defendant’s right to counsel’s presence at that time was effectively waived.
There is no evidence that defendant said anything at or before the lineup to the Assistant District Attorney that would waive his right to counsel, nor given the absence of counsel could he by either affirmative statement or simple acquiescence in the proceedings evidence his waiver (People v Settles, 46 NY2d 154, supra; People v Hobson, 39 NY2d 479; see People v Tompkins, 45 NY2d 748, 750).
The rule with respect to waiver of the right to counsel is a sound one and is premised on the theory that a defendant in custody needs counsel for more than just legal advice. *53 The custodial setting is an inherently coercive one (cf. People v Rogers, 48 NY2d 167,173), and the presence of counsel serves to dissipate the pressure on a defendant who might otherwise consider himself totally at the mercy of his captors. Moreover, it eliminates direct communication between representatives of one litigant (the People) and the defendant. In our adversarial system of justice the attorney speaks for the client and it is as inappropriate in criminal as it is in civil litigation for a party or his or its attorney to contact the other party directly once an attorney has entered the proceeding on the latter’s behalf (People v Skinner, 52 NY2d 24, 29-30). It is for these reasons that a defendant who takes it upon himself to make a judgment about his need for counsel may waive his right to counsel only in the presence of his attorney.
That rule does not end our inquiry, however, for here communication of the waiver was by counsel, rather than defendant. The issue then is whether the considerations which proscribe a waiver by defendant when communicated by him to the People out of the presence of counsel mandate that defendant and counsel be in the presence of each other when defendant’s counsel effects a waiver of his right to be present on behalf of defendant. On analysis, we conclude that on the facts of this case defendant’s attorney could waive defendant’s right to have him present at the lineup without defendant being present when the waiver was communicated.
The record is clear that defendant’s attorney had ample opportunity to discuss, and did discuss, with defendant the reasons for and effects of a waiver. It also justifies the conclusion of the courts below that on the advice of counsel and for a valid reason defendant agreed that it was best that his attorney not be present at the viewing. Defendant does not claim otherwise, arguing before us only that however well considered the advice and however well advised the waiver, it was ineffiectual unless defendant was in counsel’s presence when counsel spoke on his behalf to effectuate the waiver. We decline to impose such a requirement because to do so would serve none of the purposes for which counsel’s presence is generally required.
*54 Certainly a telephone waiver by counsel effectively eliminates any need for communication between defendant and the authorities. Furthermore, the waiver on defendant’s behalf is in no sense uncounseled merely because counsel chose to advise the District Attorney by telephone of the defendant’s waiver. Nor is the defendant more likely to waive his right to counsel due to a coercive atmosphere because his attorney chooses the telephone as his means of communication. As a practical matter, if counsel feels that the defendant is mistaken in his decision to effect a waiver of counsel, he may simply refuse to make the call until he can have a direct meeting with the defendant. In short, unless counsel is satisfied that his client’s decision to waive is a proper one, no waiver can be effected except by defendant in his counsel’s physical presence.[4]
It is well to remember that our goal is to protect the substantive rights of individual defendants, not ritualistically to impose requirements which add nothing to the protections afforded a defendant. Accordingly, we hold that defendant’s waiver of counsel having been the product of the consultation with, and the concurrent judgment of, his attorney, the waiver was valid although it was communicated to the authorities by the attorney outside the presence of the defendant. The lineup identifications were, therefore, properly admitted at trial.
Ill
We turn then to the question of whether defendant was denied a fair trial because of the Trial Judge’s unwarranted interference in the examination of witnesses. At the outset, we reject the District Attorney’s contention that the issue is unpreserved, and therefore not reviewable, because defense counsel did not object to the Trial Judge’s interference until late in the trial; CPL 470.05 (subd 2) pro *55 vides that “[f]or purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same.” To suggest, however, that an objection was required to be entered in this instance at the first sign of court interference misperceives the nature of the claim being asserted and would do an injustice to CPL 470.05 (subd 2).
The statute quite easily applies to instances at trial where a specific objection is ruled upon or where a specific requested instruction is denied, for the claim asserted is definite and limited in scope. In contrast, judicial interference in the trial must be measured both qualitatively and quantitatively before it can be said to be excessive. Because a court is entitled to question witnesses to clarify testimony and to facilitate the progress of the trial, a defense attorney cannot be expected to enter an objection to the Trial Judge’s conduct at the first sign of judicial overbearance. Quite naturally a defense attorney is not likely to enter an objection until it is clear that the Judge intends to exceed his permissible role and assume the advocate’s function. Moreover, the greater the Trial Judge’s penchant for participation in the questioning of witnesses,[5] the more difficult will it be for counsel to register objection to the Judge’s conduct for fear of antagonizing him.[6]
*56 In these circumstances it must suffice that defense counsel enters an objection to the improper conduct at a meaningful time during the trial and has not previously encouraged the objectionable conduct. Here, the record indicates that counsel did not encourage the court’s interference, and that interference continued despite counsel’s objections. While the objections were entered in the latter part of the trial, the court required counsel to make the objections in the jury’s presence, overruled them and continued his active participation in the trial. Under the circumstances the point has been adequately preserved for our review.
The role of the Trial Judge is neither that of automaton nor advocate. As defined in subdivision (a) of standard 6-1.1 of the American Bar Association Standards Relating to the Administration of Criminal Justice (Special Functions of the Trial Judge [1978]): “The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his or her initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial.” Under that standard, as the commentary to it reveals,[7] “it is appropriate for the trial judge from time to time to intervene in the conduct of a case. Thus, when it clearly appears to the judge that for one reason or another the case is not being presented intelligibly to the jury, the judge is not required to remain silent. On the contrary, the judge may, *57 by questions to a witness, elicit relevant and important facts. The judge may interrogate a witness after a cross-examination that appears to be misleading to the jury.” It is, however, important, according to that commentary that the Judge “be aware that there may be greater risk of prejudice from overintervention than from underintervention. While the judge should not hesitate to exercise his or her authority when necessary, the judge should avoid trying the case for the lawyers.”
We have recognized the Trial Judge’s vital role in clarifying confusing testimony and facilitating the orderly and expeditious progress of the trial (People v Jamison, 47 NY2d 882, 883-884; People v Moulton, 43 NY2d 944; People v De Jesus, 42 NY2d 519) but noted that the power is one that should be exercised sparingly (People v Jamison, supra, at p 883). A Trial Judge’s examination of witnesses carries with it so many risks of unfairness that it should be a rare instance when the court rather than counsel examines a witness. For example, where the court elicits crucial incriminating testimony on direct examination, the witness may be less likely to change his testimony on cross-examination. There is an increased risk that the Trial Judge will inadvertently convey to the jury his disbelief of a witness, not only by his reaction to answers, but by his phrasing of questions and tone of voice. Apart from these risks there is a substantial danger that the court’s participation in the trial will result in an unfair tactical advantage to a party.[8] For example, a defense attorney who would object to a question if posited by the District Attorney might well be dissuaded from doing so if the question were asked by the Trial Judge, for fear of antagonizing the Judge or of creating the impression that he seeks to hide the truth. Even worse, as happened here, the judicial questioner may in the guise of clarifying testimony, conduct what amounts to a running redirect examination during defense counsel’s cross, thereby rendering it ineffective. The defense, however, has no similar oppor *58 tunity of interrupting the prosecution’s direct examination by a similar running cross-examination and may, in consequence, find it much more difficult to persuade the jurors that there is an alternative innocent interpretation of the events in issue. In short, the risks of unfairness are so many and potentially so great that the Judge should rarely, if ever, indulge in an extended questioning of the witnsses for either side.
This is not to say that a Judge may never intervene. He may, for example, if a witness has a language difficulty, intervene to clarify unclear answers. He may also properly question witnesses to insure that a proper foundation is made for the admission of evidence. In last analysis, however, he should be guided by the principle that his function is to protect the record, not to make it.
The record shows that the Trial Judge asked more than 1,300 questions during the course of the trial. Though substance and not the number of questions asked is the important consideration and though some of the questions were clearly appropriate by way of clarification or because of language difficulties, there can be no question that in his substantial examination of the witnesses the Trial Judge departed from his appropriate role in a number of respects.
The first is the extent to which direct examination of the witnesses was conducted by him. He elicited the essential facts of the murder from Rosabel Ortiz, the People’s first eyewitness. He then elicited from Rosabel Ortiz testimony that she had previously identified the defendant at a lineup. Though ultimately he sustained a defense objection to his own questions, the court next attempted to bolster Rosabel Ortiz’ in-court identification by eliciting from her testimony that she lived in a neighborhood populated by Chinese persons and that she recognized facial differences among them.
When Marivel Ortiz took the witness stand the court elicited significant portions of her testimony about the murder. Although the prosecutor initially obtained an in-court identification from Marivel Ortiz, the Trial Judge strengthened it immeasurably during his direct examination of the witness. He also gave significant assistance to *59 the prosecutor in eliciting Marivel Ortiz’ testimony that she had previously identified the defendant at a lineup. Indeed, the court reinforced the witness’ testimony by repeatedly asking her if she had picked out the defendant and if she was sure.
The court also elicited important direct testimony from Michael Chin, who placed defendant at the scene of the crime shortly before the murder. Although there are other instances where the court elicited direct testimony from these and other witnesses, it is enough to note that the court engaged in quite extensive direct questioning of the three most important witnesses for the prosecution.
Indeed, it was during the court’s direct examination of Rosabel Ortiz that the Trial Judge mistakenly referred to the shooter as “the defendant”, although no witness had up to that point identified defendant as the killer. In addition, the court in direct examination elicited testimony which tended to make the testimony of the Ortiz sisters dovetail better. For example, Rosabel Ortiz had testified that the decedent’s body lay in a north-south direction, with the head facing south. The court obtained essentially the same information from Marivel Ortiz. Rosabel Ortiz had testified that after the shooting the defendant proceeded to the corner of the block, then looked to the left, to the right, and finally directly at her. The court elicited similar testimony from Marivel Ortiz. In short, the court’s direct examination tended to strengthen the testimony of the two eyewitnesses to the killing, without which defendant could not have been convicted.
By far the most prejudicial conduct of the Trial Judge, however, was his constant interruption of defense counsel’s cross-examination to ask questions which would only be proper as redirect examination if asked by the prosecutor. Only one area of inquiry will be used for purposes of illustration, but it is the most important one. Each of the prosecution’s three most important witnesses could be impeached on cross-examination. Michael Chin placed defendant at the scene of the murder by his testimony that he had seen defendant in a beige Nova on Eldridge Street shortly before the murder. Defense counsel sought to impeach Chin by forcing him to admit that he had previously told one Tin *60 Hung Lee that defendant was not in the car, and by forcing Chin to admit that he had previously told defense counsel’s investigator that he was not sure that defendant had been in the beige Nova. The Judge interrupted defense counsel’s cross-examintaion and by repeated and leading questions elicited Chin’s explanation that he lied to Tin Hung Lee because he was afraid that she would revert her allegiance to defendant’s gang and did not want her to know that he could identify defendant as a passenger in the beige Nova. The court also obtained from Chin an explanation of why he had lied to the defense investigator.
In cross-examining Rosabel Ortiz, defense counsel sought to impeach her direct testimony by forcing her to admit that at the Wade hearing she had testified that she thought defendant was the shooter but she was not sure. Interrupting the cross-examination, the court asked Rosabel Ortiz if she was presently sure that defendant was the killer, to which she answered “it looks very much like him”.
Defense counsel was able to impeach Marivel Ortiz’ identification testimony even more effectively. He forced her to admit that she had told the defense investigator that it was too dark to see the shooter and that she had previously told defense counsel that she was not sure that the person she had selected from the lineup had committed the murder. The court interrupted cross-examination and elicited Marivel’s testimony that she had in fact seen the shooter’s face on the night of the killing. Later the court’s questioning brought out from Marivel that when she told defense counsel she was not sure that his client was the shooter, she had lied to him because she wanted to be left alone.
Finally, because of its potential impact on the trial testimony of the witness, we note one instance of redirect by the court in the midst of defense counsel’s cross-examination at the Wade hearing. At that hearing defense counsel forced Marivel Ortiz to admit that she had told the defense investigator that on the night of the murder it was too dark to see the shooter’s face. The court interrupted and asked whether Marivel Ortiz had been able to see the shooter’s face. Initially, she responded that she could “not hardly” *61 see his face, that she “didn’t see it that clear” and that she had not seen it clear enough to identify the shooter. Under continued questioning by the court, Marivel Ortiz ultimately stated that she was certain that defendant had done the shooting. In short, the record is replete with instances in which the court interrupted cross-examination to conduct what may be characterized as redirect examination and thereby defeated defense counsel’s attempt to shake the witness’ testimony.
The last item of the trial court’s conduct on which we comment is the repeated reference to the gang affiliations of the decedent, the defendant and others such as Tin Hung Lee. Indeed, when introducing the jury to the case, the Trial Judge informed them that the indictment alleged that defendant, a member of a group known as the Black Eagles, shot and killed Fong Yue Yee, a member of a group known as the Ghost Shadows. The indictment nowhere referred to the gang affiliations of the defendant or the decedent. When defense counsel requested a mistrial, the court denied the motion on the ground that it expected the prosecution to attempt to prove a motive and that the motive would be gang rivalry. There was no record evidence that gang rivalry had generated similar assaults or murders in the past or that the alleged murder was caused by gang hos-r tility. The Judge during trial not only permitted inquiry by the District Attorney into gang membership but himself participated in the inquiry, either ignoring or overruling defense counsel’s repeated objections. This was obviously a subject better left to inquiry by the District Attorney, if it was to be permitted at all.
The only conclusion that can be reached on this record is that the defendant was denied a fair trial by the Trial Judge’s persistent and improper interference in the examination of witnesses. We therefore reverse and remit for a new trial before a different Judge.

. (United States v Wade, 388 US 218.)

. Stone was unclear concerning whether his discussion with defendant occurred before he left the District Attorney’s office or on the telephone. Defendant’s new attorney indicated his intention to call defendant as a Wade hearing witness to testify that no such conversation occurred, but when the court indicated an intention to allow cross-examination concerning whether defendant protested counsel’s absence, withdrew defendant as a witness. The Hearing Judge found that defendant had agreed in a telephone conversation with Stone that Stone’s presence was not necessary and concluded that defendant and his counsel had waived the presence of counsel at the moment of identification.

. Sears’ fear may not have been totally unfounded. The Assistant District Attorney reported a telephone call from Marivel Ortiz’ boyfriend in which he detailed a call to him threatening her life and the lives of his mother and MarivePs mother if the Ortiz sisters testified.

. That defendant had talked to his attorney by telephone would not be sufficient by itself. People v Tompkins (45 NY2d 748, supra) involved waiver by a defendant who, after talking on the telephone with his attorney, announced to the authorities his intention to disregard the attorney’s advice and make a statement in the attorney’s absence. We held that statement inadmissible, the attorney not having been present when defendant communicated it, a different situation from the present case in which the communication with the authorities is by counsel after obtaining defendant’s counseled consent.

. That the problem is not a new one, see People v Ohlstein (54 AD2d 109, 113, affd 44 NY2d 896) (“We must parenthetically note that the zeal of the Trial Justice in this case [e.g., in his interjection in questioning], while not rising to the level of reversible error, should in the future be curbed. A Trial Justice must be impartial and dispassionate and not appear as an advocate”), as well as People v Mees (47 NY2d 997), both involving interference in the trial process.

. The difficulty of presenting such an objection is well illustrated by the record before us. Defense counsel first objected to the Trial Judge’s interference when the Judge attempted to conduct a direct examination of a defense witness. Defense counsel objected that the Judge was cross-examining and asked that he be allowed to resume direct examination. The court ignored the objection and continued questioning the witness. When the court continued examining the witness, defense counsel requested a sidebar to renew the objection. Three times the court refused a sidebar and ultimately excused the jury only to scold defense *56 counsel for Ms persistence. Defense counsel, apparently believing that it was important to register Ms objection before further court examination, asked to state his objection while the jury was out of the courtroom. Again the court refused. When defendant asked that the record reflect that the Judge was shouting, he was held in contempt of court. Only after trial resumed and the court had completed examination of the witness did he allow defense counsel to object, and then only in the presence of the jury. Then defense counsel again objected, stating: “Judge, [t]hat you’re conducting cross-examination for the prosecution, that you’re assuming the prosecution’s function”. The objection was overruled, as was the succeeding objection to being forced to make Ms objections to the Judge’s actions in front of the jury.

. See, also, the Introduction to the 1972 Approved Draft of the Standards at pages 3 and 4.

. Nor will the unfairness generally be curable by an instruction such as was given here that the court’s questions are to be given no greater weight than those of the attorneys. .