THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
FRANKIE TUCKER, Appellant.

First Department, October 19, 1982

### APPEARANCES OF COUNSEL

*Bertrand J. Kahn* of counsel (*William E. Hellerstein,* attorney), for appellant.

*Joyce P. Adolfsen* of counsel (*Vivian Berger* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

### OPINION OF THE COURT

LYNCH, J.

The defendant was convicted after a jury trial of murder in the second degree for having caused the death by stabbing of Gordon Evans. We find that the excessive interference of the Trial Judge in the conduct of the trial and his repeated assumption of the role of the prosecutor seriously prejudiced the defendant so that the conviction must be reversed and a new trial ordered.

In *People v Ellis* (62 AD2d 469, 470) this court held: "A Trial Judge in a criminal action is not merely an observer nor only a referee. It is the Judge's duty to assume an active role in the examination of witnesses where proper or necessary to elicit or develop significant facts, to clarify or enlighten an issue, or to facilitate or expedite the orderly progress of the trial * * * 'However, because of the ever present and serious threat that a jury's determination may be influenced by what it interprets to be the court's own opinion, this prerogative should be exercised with caution.' * * * Where the Trial Judge oversteps the bounds and assumes the role of a prosecutor, however well intentioned the motive there is a denial of a fair trial and there must be a reversal."

More recently the Court of Appeals in *People v Yut Wai Tom* (53 NY2d 44) discussed and condemned particular instances of Trial Judge interference and thus drew boundaries which if exceeded would warrant reversal of a conviction. On the trial of this action, the Trial Judge violated nearly every standard of conduct set forth in *Yut Wai Tom*.

*Yut Wai Tom* (*supra,* p 57) cautioned that "[a] Trial Judge's examination of witnesses carries with it so many risks of unfairness that it should be a rare instance when the court rather than counsel examines a witness". Here, the Trial Judge did not exercise sparingly his power to examine the witnesses. He questioned each one of them, some at great length, not waiting for the attorneys to develop or refute a point, but interjecting himself into their questioning whenever it suited his compulsion.

*Yut Wai Tom* (*supra,* p 57) points out the risk of unfairness "where the court elicits crucial incriminating testimony on direct examination [because] the witness may be less likely to change his testimony on cross-examination". Here, by his own questioning, the Trial Judge established: that a letter opener the defendant was claimed to have habitually carried on his person was intended by him to be a weapon; that it was seen on the defendant up to the date of the stabbing but it was not seen after the stabbing; that the fatal wound to the victim could have been caused by the letter opener. Apart from thus taking over the role of prosecutor, the Trial Judge, by developing this crucial

testimony from his own questioning, put defense counsel to an unfair disadvantage specifically noted in *Yut Wai Tom,* namely that an objection by counsel might antagonize the Judge or create for the jury an impression that counsel was trying to hide the truth.

The disadvantage to defense counsel was compounded when the Trial Judge's questions led the witnesses in a fashion that no Judge would have permitted to an attorney. The court questioned the witness Blackwell who, unaided, was able only to state that the defendant had shown him the letter opener "maybe about a month before" the stabbing. It was the Judge who supplied the telling evidence in his next question, "You saw it a month before, then closer to the time of Gordon Evan's death and then closer still", to which the witness answered, "Yes".

The Trial Judge supplied similar crucial evidence to the witness Shelton. The latter testified that over the 10 years he had known the defendant he had seen him with the letter opener three or four times and that this occurred over the period of a year. The court then continued questioning:

"THE COURT: Over a period of one year?

"THE WITNESS: Yes

"THE COURT: In other words, from '76 to '77?

"THE WITNESS: Yes

"THE COURT: '76 up to February 8th, '77 [the date of the stabbing]?

"THE WITNESS: Yes."

Another unfairness condemned by *Yut Wai Tom* (*supra,* p 57) is for the Trial Judge to conduct "a running redirect examination during defense counsel's cross, thereby rendering it ineffective". Here, an elevator operator testified on direct that on the day of the stabbing he took the defendant, a frequent passenger, to the victim's floor. The operator also described other passengers who were in the elevator that day with the defendant. To attack his credibility, the defense counsel on cross-examination got the operator to admit that he could not remember if passengers were present on other occasions when the defendant was in

his elevator. Immediately, without waiting for cross-examination to conclude or giving an opportunity for redirect, the Trial Judge leaped into the breach to rehabilitate the witness by questions designed to show that he had reason to remember the particular occasion by the defendant's conduct on the elevator and the stabbing later that day. In similar fashion, the court took over the rehabilitation of the witness Lafurn.

Another example of the court's taking over the role of prosecutor occurred when defense counsel objected for lack of foundation to admission into evidence of handwritten notes sought to be attributed to the victim. The court immediately took over the questioning of the witness to lay the foundation and then, satisfied with his own efforts, overruled the objection.

One of the risks of judicial questioning of witnesses recognized by *Yut Wai Tom* (*supra,* p 57) is "that the Trial Judge will inadvertently convey to the jury his disbelief of a witness, not only by his reaction to answers, but by his phrasing of questions and tone of voice". Here it was important for the defense that the jury believe that the defendant had been with Tommy Hunt at a Chock-Full-O'-Nuts on the day of the stabbing, February 8, 1977. Hunt had denied such a meeting, testifying that he had been out of the country from 1969 to 1979. The defendant had difficulty putting to the jury coherent testimony on this point because he was constantly interrupted by questions from the court. Some of the questions left little doubt that the court was incredulous.

"THE COURT: Was that the Tommy Hunt — The Tommy Hunt that was on the stand, is that the Tommy Hunt you say you met in Chock Full O'Nuts?

"THE WITNESS: That's the Tommy Hunt.

"THE COURT: That Tommy Hunt?

"THE WITNESS: That Tommy Hunt.

"THE COURT: All right * * *

"THE COURT: You saw him in Chock Full O'Nuts on February 8th?

"THE WITNESS: February 8th.

"THE COURT: 1977?

"THE WITNESS: Right.

"THE COURT: Chock Full O'Nuts, 50th Street and Broadway?

"THE WITNESS: Right.

"THE COURT: City of New York?

"THE WITNESS: Right.

"THE COURT: Right here in the city?

"THE WITNESS: Manhattan."

The dissent notes that the Trial Judge improperly implied in one of his questions that the letter opener was blunt on one edge and sharp on the other. It concedes this to be "troublesome", as indeed it is, because there was no evidence in the record of these characteristics of the letter opener and the Trial Judge in effect supplied this evidence to the prosecutor's case (just as he supplied evidence in examining Blackwell and Shelton). This is serious error. The dissent would, however, discount it, finding the defendant's guilt without reasonable doubt. But this judgment must have been made in the context of the trial as it was conducted. We stress the finding that had the trial been free of these errors and the other devastating incursions of the Trial Judge the defendant would have had a fair opportunity to persuade the jury of reasons to doubt his guilt. As it was, he was denied this chance.

*People v Charleston* (56 NY2d 886), relied upon by the dissent, does not require a different result. It holds that a failure by defense counsel to object to judicial interference does not preserve a question of law for appellate review. Absent a question of law, the record here constrains us to reverse as a matter of discretion in the interest of justice. Also, because the determination of prejudice through judicial interference demands a qualitative and quantitative measurement (*People v Yut Wai Tom, supra,* p 55), *Charleston* is not absolute in its terms. Where, as here, the conduct complained of represents a gradual accumulation of judicial interjection which in totality is prejudicial, a difficult if not impossible burden is cast upon defense counsel to know at what point to object. This is an "extreme

form" of conduct which *Charleston* finds (p 888) "might excuse a defendant's failure to make an appropriate objection". *Charleston* also excuses lack of objection (p 887) "when it is clear from the record that objection would have been unavailing". There is no reason to believe that had objection been made during the trial, the Trial Judge would have felt any differently than he did when his conduct was made a basis for a motion to set aside the verdict, namely that what he did was a part of his duty "to prevent confusion and to aid and assist in the search for the truth".

Judgment, Supreme Court, New York County (B. ROBERTS, J.), rendered March 28, 1979, convicting defendant after a jury trial of murder in the second degree and sentencing him to a prison term of 15 years to life should be reversed, on the law and as a matter of discretion in the interest of justice, and a new trial directed before another Justice.

ASCH, J. (dissenting). The issue on this appeal involves defendant's contention that the trial court excessively participated in the trial, to the extent of depriving defendant of a fair trial.

It is beyond cavil that the Trial Judge inappropriately participated in the examination of witnesses. But the outcome of this appeal should not have the vindication or condemnation of that Judge as its focus. What is critical is whether or not the defendant was fairly convicted. Examination of the record makes it clear that defendant's alibi defense was disproven and his guilt proven beyond a reasonable doubt.

There was no objection by defense counsel at a meaningful time during the trial to the alleged misconduct on the part of the trial court. Further, in certain instances, defense counsel himself implicitly invited the trial court to examine the witness. There is in the entire trial transcript only one real troublesome instance respecting the trial court's participation in the examination of witnesses: Dr. Rho, the Deputy Chief Medical Examiner, testified that the wound which the decedent suffered was caused by a sharp instrument, such as a knife, that was at least 4 to 5

inches long, no more than 1⅛ inch wide, with a cutting edge on one side and a blunt edge on the other. The letter opener which was in defendant's possession prior to the crime was physically described by the witnesses in respect to length and width and sharpness of point. However, there was no specific testimony as to whether the letter opener which was carried by the defendant as a weapon was blunt on one edge and cutting on the other. The Medical Examiner had testified that the type of weapon which could be used to inflict such a wound might be a knife. The trial court at this point inquired whether the wound could have been inflicted by "a letter opener which was sharp on one side and dull on the other * * * which would be ten inches long and approximately an inch wide." The Medical Examiner answered in the affirmative, and defense counsel objected to the trial court's question. In a postverdict motion, defendant claimed that the trial court exceeded its discretion by making inquiry of the Medical Examiner as to whether the wound suffered by the decedent was consistent or inconsistent with having been inflicted by a letter opener. The trial court explained in denying the motion, that the question was proper "to prevent confusion in the minds of the jurors" and that "it is the duty of a court to prevent confusion and to aid and assist in the search for truth."

If this were a weak circumstantial case, then an argument might be advanced with some merit that the trial court committed reversible error in this particular instance. However, the circumstantial evidence is, as already noted above, strong and defendant's alibi defense was totally demolished. The actions by the trial court in no way compare to the egregious conduct set forth in *People v Yut Wai Tom* (53 NY2d 44). Apparently the trial court was trying to convey to the jury the fact that the murder weapon did not have to be a knife, but could also be a letter opener. While defendant did not receive a perfect trial, the record unequivocally demonstrates that he received a fair trial.

Finally, it is clear on this record that the defendant has not preserved for appellate review the issue whether extensive participation by the Trial Judge in questioning witnesses deprived him of a fair trial.

Perhaps if this appeal had come before us a year ago, the issue it presents would have been easier to decide. (*People v Yut Wai Tom, supra.*) In that case, the question of whether a defendant was denied a fair trial because of the Trial Judge's unwarranted interference in the examination of witnesses was deemed reversible conduct although defense counsel did not object to such intervention until late in the trial.

But the law is not static. Just recently, *People v Charleston* (56 NY2d 886) was decided and it clearly governs the instant situation.

There, the defendant contended on appeal that the Trial Judge's extensive participation in the questioning of witnesses deprived him of a fair trial. The Court of Appeals held that such a claim is preserved for appellate review: "[W]hen there has been an objection at trial in some form sufficient to give the Judge an opportunity to correct the problem or when it is clear from the record that objection would have been unavailing * * * [A]fter it becomes 'clear that the Judge intends to exceed his permissible role and assume the advocate's function' (53 NY2d, at p 55), it is incumbent upon defense counsel at least to attempt to register some protest to that conduct to preserve the matter for appellate review. In addition, the objection or objections must be of a nature to apprise the Trial Judge that it is his or her intrusion into the conduct of the trial that is at issue * * * [A]lthough defense counsel objected * * * to questioning by the Trial Judge, the record indicates that the objections were directed to specific questions rather than to the Judge's general course of action or participation as a whole. By failing to call the Judge's attention to his allegedly prejudicial conduct, defendant did not offer him an opportunity to alter or correct it * * * '[T]he greater the Trial Judge's penchant for participation in the questioning of witnesses, the more difficult will it be for counsel to register objection to the Judge's conduct for fear of antagonizing him' * * * and it is conceivable that *in an extreme form* this might excuse a defendant's failure to make an appropriate objection. There is no indication in the record, however, that such a situation was present here. Defendant's failure to make an appropriate objection

or to move for a mistrial, therefore, must preclude review of his claim" (*People v Charleston, supra,* pp 887-888; emphasis supplied).

We affirmed the judgment of the Supreme Court, New York County (B. ROBERTS, J.), rendered September 7, 1979, after a jury trial, convicting defendant James Charleston of, *inter alia,* attempted murder in the second degree and in so doing rejected defendant's argument that the Trial Judge's extensive participation in the questioning of witnesses deprived him of a fair trial (*People v Charleston,* 81 AD2d 1045). Appellant Charleston in his brief filed with this court noted as follows: "During the course of the trial, the judge asked 757 questions, which amounted to 32.81% of the total number of questions asked. *The Court asked more questions during the trial than the prosecutor did* * * * Not only did the Court unduly interfere with the orderly presentation of evidence and with the function of counsel, it interfered in a way that was absolutely harmful and prejudicial to defendant. For example, during the examination [of the doctor who examined the victim], the Court asked 56.82% of all the questions asked — *more than the prosecutor and defense counsel combined.* In addition to asking so many questions, the manner in which the Court asked them was prejudicial to the defendant in that the Court constantly repeated testimony * * * Through its questioning, the Court elicited testimony that served to bolster the credibility of the witness as an expert. During direct examination the Court took over the questioning and had the doctor repeat the gory details of the alleged crimes. The Court kept repeating testimony as to the seriousness of the injuries, thereby seeming to adopt and verify such testimony * * * The Court habitually usurped counsels' role by asking numerous sequential questions and deflecting the attorneys' approaches * * * These usurpations were highly prejudicial to defendant * * * Considering the record * * * it is clear that the trial judge committed reversible error by intemperately and constantly interjecting himself into the trial, by 'testifying', by emphasizing inculpatory evidence, and by usurping the roles of counsel * * * all of which the Court did in a manner highly prejudicial to defendant."

The People in their brief to this court in *Charleston* aptly noted that while defense counsel objected three times to specific questions by the Trial Judge, he never objected to the Judge's general course of action or participation as a whole. In affirming our unanimous affirmance of the judgment of conviction in *Charleston,* the Court of Appeals acknowledged the validity of the People's observation (56 NY2d 886).

Examination and comparison of the record on appeal in this case with that in *Charleston* on the issue of excessive interference of the Trial Judge in the conduct of the trial does not disclose a qualitative or quantitative substantial distinction so as to warrant a departure from the rationale enumerated by the Court of Appeals in Charleston or the conclusion that the instant record presents an "extreme form" of judicial conduct so as to excuse the defendant's failure to make an appropriate objection.

*Charleston (supra)* does not enunciate a completely new test for what constitutes an "unfair trial" mandating reversal. But as I read the opinion, it comprehends the precise situation before us. Defendant failed to object to the conduct of the Trial Judge and thereby forfeited his claim on appeal.

I applaud the desire of my colleagues in the majority to maintain those principles of law which protect persons accused of crime. However, as an intermediate court, we are bound by the rulings of the next highest tribunal in the judicial pecking order. Therein rests one of the quintessential protections against arbitrary encroachments on individual freedom.

Accordingly, the judgment, Supreme Court, New York County, rendered March 28, 1979, convicting defendant, after a jury trial, of murder in the second degree and sentencing him to an indeterminate term of 15 years to life, should be affirmed.

MURPHY, P. J., and FEIN, J., concur with LYNCH, J.; ASCH, J., dissents in an opinion.

Judgment, Supreme Court, New York County, rendered on March 28, 1979, reversed, on the law and as a matter of

discretion in the interest of justice, and a new trial directed before another Justice.