Felipe GARCIA, Petitioner-Appellant,

v.

WARDEN, DANNEMORA CORREC-
TIONAL FACILITY,
Respondent-Appellee.

No. 1274, Docket 85–2250.

United States Court of Appeals,
Second Circuit.

Argued May 7, 1986.

Decided June 30, 1986.

J. Jeffrey Weisenfeld, New York City, for petitioner-appellant.

Carol Ethridge Gette, Ass't Dist. Atty. of The County of New York, New York City (Robert M. Morgenthau, Dist. Atty. and Norman Barclay, Ass't Dist. Atty., New York City, of counsel), for respondent-appellee.

Before VAN GRAAFEILAND, KEARSE and MINER, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

This is an appeal from an order of the United States District Court for the Southern District of New York (Conner, J.), 613 F.Supp. 302, denying appellant's petition for a writ of habeas corpus. Appellant seeks to vacate a 1978 judgment of the New York State Supreme Court convicting him of Intentional Murder and Felony Murder. He contends that the evidence introduced at his trial was insufficient to sustain his conviction and that he was deprived of a fair trial by improper conduct on the part of the trial judge. We affirm the dismissal of the petition.

## THE SUFFICIENCY OF THE EVIDENCE

Early in the morning of February 13, 1977 Collins Monden and Phillip Moulton-Peddie were shot and mortally wounded in the vestibule of an apartment building on 147th Street in Harlem. The State proved that, earlier on the same morning while the two victims were at an after-hours nightclub with one Sonia Tarleton, they attempted to purchase some cocaine from petitioner Garcia. The three men, Tarleton, and Garcia's girlfriend, Ampara Suero, then left the club together and went to 147th Street. Monden parked across the street from the apartment building where the killings occurred and instructed Tarleton to remain in his car.

Monden and the other three walked up 147th Street to Amsterdam Avenue for the declared purpose of making a telephone call to a source of cocaine. After a short time, the four returned and entered the apartment building. Garcia had told Monden that, if his telephone call proved unproductive, he personally would sell Monden whatever cocaine he had in his possession. The State contended that, although the group entered the apartment building for the ostensible purpose of completing the drug transaction in the privacy of the vestibule, what actually occurred was the killing by Garcia of the two would-be purchasers and his theft from Monden of jewelry and cash valued at over $4,000.

In support of its contention, the State proved that the inner door of the vestibule was locked and that the only entrance was through the outer door. Miss Tarleton, called as a prosecution witness, testified that she saw Ampara Suero leave the vestibule, followed some time later by Garcia, but that no one other than the original four entered the vestibule until after the killing was discovered.

Garcia subsequently admitted to a police officer that he had been in the vestibule with Monden and Moulton-Peddie, but told the officer that a man named Raymond Ventura entered the vestibule and ordered him to leave; that as he walked away from the building, he heard two gunshots. Garcia also told the officer that Ventura subsequently gave him Monden's jewelry to sell. Garcia called as a witness one Mario Jimenez, who testified that, shortly after the killings, while he with four or five other people was in the washroom of a bar, he heard Ventura admit to Garcia that he, Ventura, was the murderer. However, Ventura then was called as an adverse witness by the defense and denied the conversation, denied that he had been at the 147th Street apartment building at all, and denied that he had killed the victims. A ground floor resident of the apartment building, called as a witness by the prosecution, testified that she looked out her front window after hearing the shots and saw a man walking away from the front door. Although she did not see the man's face, his general appearance, as she described it, was very similar to that of Garcia, while not at all like that of Ventura. Garcia's girlfriend, Ampara Suero, did not testify.

■ When the evidence, which we have merely highlighted, is viewed in the light most favorable to the State, it cannot be said that no rational trier of the fact could have found petitioner guilty beyond a reasonable doubt. The quantum of proof clearly satisfied the requirements of due

process. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Gruttola v. Hammock,* 639 F.2d 922, 927–28 (2d Cir.1981).

## MISCONDUCT OF THE TRIAL JUDGE

■ The case was tried before a State court judge who has a well-deserved reputation for overzealous participation in trial proceedings. *See People v. Yut Wai Tom,* 53 N.Y.2d 44, 439 N.Y.S.2d 896, 422 N.E.2d 556 (1981); *People v. Mees,* 47 N.Y.2d 997, 420 N.Y.S.2d 214, 394 N.E.2d 283 (1979) *(mem.); People v. Tartaglia,* 35 N.Y.2d 918, 364 N.Y.S.2d 901, 324 N.E.2d 368 (1974) *(mem.); People v. Kelly,* 65 A.D.2d 686, 409 N.Y.S.2d 730 (1978) *(mem.); People v. Ellis,* 62 A.D.2d 469, 404 N.Y.S.2d 862 (1978) (per curiam). However, extensive questioning by a trial judge does not necessarily equate with unfairness, and the New York appellate courts have demonstrated an obvious ability to determine whether the boundary line between fairness and prejudice has been crossed. *See People v. Biondolillo,* 63 A.D.2d 610, 404 N.Y.S.2d 864 (1978) *(mem.); People v. Ohlstein,* 54 A.D.2d 109, 387 N.Y.S.2d 860 (1976) (per curiam), *aff'd,* 44 N.Y.2d 896, 407 N.Y.S.2d 696, 379 N.E.2d 222 (1978); *People v. Williams,* 52 A.D.2d 540, 382 N.Y.S.2d 86 (1976) *(mem.); People v. Kee,* 45 A.D.2d 704, 357 N.Y.S.2d 81 (1974) *(mem.).* Moreover, as a general rule, New York appellate courts will not even consider claims of excessive interference by a trial judge unless timely objections were addressed to the judge's course of conduct in such a manner as to put him on notice that his conduct was felt to be improper. *People v. Charleston,* 56 N.Y.2d 886, 453 N.Y.S.2d 399, 438 N.E.2d 1114 (1982) *(mem.).*

■ There were no such objections in the instant case. Defense counsel objected to several questions posed by the court, but only on the ground that they were leading or otherwise improper, not because it was the judge who had asked them. On one occasion, defense counsel did object to facial expressions which he said the judge had made. However, the judge denied making any facial expressions, and the prosecutor concurred in this denial. The court also offered to poll the jury "to see whether or not they saw anything", but this offer was declined. Although the merits of counsel's "facial expressions" objection cannot be determined from the record, the mere fact that the objection was made shows that defense counsel was not intimidated from voicing any complaints he might have concerning the judge's conduct. Indeed, the judge expressly encouraged counsel to record whatever objections he had. Counsel's failure to do so barred him from arguing judicial improprieties for the first time in the Appellate Division.

Appellant's complaint concerning allegedly improper marshaling of the evidence likewise could not be voiced for the first time in the Appellate Division. *People v. McCright,* 107 A.D.2d 766, 767, 484 N.Y. S.2d 604 (1985) *(mem.); People v. Cherry,* 106 A.D.2d 458, 482 N.Y.S.2d 551 (1984) *(mem.).*

The State having argued procedural bar in the Appellate Division and the Appellate Division having affirmed without opinion, we will presume that the Appellate Division's rejection of appellant's complaints against the trial judge was on the procedural ground urged by the State. *Rodriguez v. Scully,* 788 F.2d 62, 63 (2d Cir. 1986). Because appellant has not shown any cause for the procedural default, the district court did not err in rejecting the same complaints. *Id.*

■ Even if we were to assume that the Appellate Division considered the merits of appellant's complaints of judicial misconduct, we still would affirm the district court's rejection of appellant's habeas corpus petition. Our power to review the conduct of a state trial court is "the narrow one of due process and not the broad exercise of supervisory power that we would possess in regard to our own trial court." *DeChristoforo v. Donnelly,* 473 F.2d 1236, 1238 (1st Cir.1973) (*quoted with approval in reversing opinion, Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct.

**8**

1868, 1871, 40 L.Ed.2d 431 (1974)). A State trial judge's conduct would have to be significantly adverse to the defendant before it violated the constitutional requirement of due process and warranted federal intervention. *Daye v. Attorney General of the State of New York,* 712 F.2d 1566, 1572 (2d Cir.1983), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). Although we would not recommend that the trial record in the instant case be used as a model for fledgling judges, we are satisfied that it demonstrates no violation of appellant's due process rights.

■ There was a substantial language problem on the part of several foreign-born witnesses, which required close monitoring by the trial judge. Two of the other witnesses were elderly and extremely diffident widows. The trial did not follow a routine course. The defendant produced Jimenez, a late-blooming witness, who testified that he had overheard Ventura confess in a crowded washroom that he had murdered Monden and Moulton-Peddie. Defense counsel then put Ventura on the stand and Ventura denied everything. Not surprisingly, defense counsel at one point approved of the judge's questioning and, at another point, even requested the judge's help. Although the judge should have exercised greater restraint in his attempts to eliminate uncertainty and confusion, our review of the record satisfies us that his conduct did not prejudice the defendant to such a degree as to deprive him of his constitutional right to due process. *Id.*

Affirmed.