■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v

Toby S. Tucker, Appellant.—Levine, J.

At about 3:50 A.M. on August 11, 1986, Officer William Biggs of the Police Department of the Village of Green Island, Albany County, while on routine patrol in a marked police car, observed two black males, later identified as defendant and Stephen Stukes, walking in a southerly direction on Hudson Street toward the Green Island Bridge linking the village to the City of Troy, Rensselaer County. Defendant was carrying a green duffel bag and Stukes was carrying a red and gold shopping bag. Biggs observed that both men furitively kept their eyes fixed on the police car in both directions as is passed them. Biggs continued driving to the end of his patrol zone and turned back to pass the two males a second time, whom he observed had been joined by a woman, subsequently identified as Bonnie Forant, also carrying a bag. The three continued to concentrate their attention on the movements of the patrol car. Biggs then drove past them a third time, at which point they had reached the foot of the bridge. The officer continued over the bridge to Troy and decided that he would stop the three, but first radioed to another patrol car for assistance. He turned around and retraced his movements over the bridge toward defendant, Stukes and Forant, who were almost at the bridge's midpoint, walking toward him. As Biggs approached to a distance of 35 yards, he observed defendant and Forant throw the bags they were carrying over the side of the bridge. He then drove his vehicle across the median, parked in front of the three and exited the police car. When defendant, Stukes and Forant reached him, Biggs told them to stop, that he wanted to talk to them. In answering the officer's initial questions, the three first denied throwing the bags off the bridge, then defendant explained that they did it because he "knew [the police] would accuse them of something". They professed to have had no documents of identification and gave evasive or demonstrably false answers as to their identities, addresses, dates of birth and where they had come from. The second police officer had by then arrived and detained the three while Biggs went to retrieve the two bags which had landed on a river bank under the bridge, disgorging some of their contents upon impact. Biggs collected the bags and their contents which he saw consisted mainly of Roman Catholic religious articles, some of which were only used in

church rites. Despite this, Forant claimed that the items were hers and that the two males were helping her in the process of moving. A second officer then asked defendant, Stukes and Forant if they would be willing to come to police headquarters "and straighten this matter out, find out where this stuff belonged". The three assented. No guns were drawn by the police nor were handcuffs employed. A pat-down frisk turned up a retractable razor knife in the possession of Stukes.

At the police station, a more thorough search of the green duffel bag revealed a wallet containing a driver's license issued to a Gary Sipperly of Green Island. One of the police connected this with a Father Sipperly, a Roman Catholic priest at a church in the village. Upon reaching Father Sipperly by telephone at the church rectory, the police were informed that two men and a woman had forced their way into the rectory that night and had bound and gagged him. The priest came to the police station and made a positive identification of defendant, Stukes and Forant through a one-way mirror. The three suspects were then formally placed under arrest. Subsequently, the police recovered from the suspects a religious medal belonging to Father Sipperly and cash in the exact amount and denominations that the victim stated had been in his wallet at the time of the robbery.

Defendant, Stukes and Forant were indicted for burglary in the first degree and robbery in the first and second degrees. Stukes, aged 15, was permitted to plead guilty as a juvenile offender. Following a suppression hearing, County Court suppressed the statement of defendant to the police, obtained after he had expressed a desire to consult a lawyer. County Court also suppressed the showup identification by the victim at the police station, but found that there was an independent basis for an in-court identification. County Court refused to suppress any of the various stolen articles or the weapon taken from Stukes during the initial frisk. Defendant and Forant were found guilty after a jury trial on all counts. This appeal by defendant ensued.

Defendant's first point on appeal is that the physical evidence introduced at the trial should have been suppressed as the result of an unconstitutional stop or arrest. Defendant relies principally on Biggs' testimony at the suppression hearing that he intended to stop and question defendant and his companions merely on the basis of their presence on the bridge at that early hour of the morning, carrying bags, and their observable reaction to his surveillance of them from the police car, which, under *People v De Bour* (40 NY2d 210) is

insufficient as a matter of law to invoke the common-law right of the police to stop and inquire. Irrespective of the officer's earlier decision to stop defendant, however, the fact is that, before there was any manifestation of that intent, and before defendant, Stukes and Forant were exposed to any restraint whatsoever in their freedom of movement or a threat thereof, the three jettisoned the bags over the bridge. That conduct, taken in conjunction with the other circumstances previously alluded to, amply furnished the officer with the factual basis for a founded suspicion that criminal activity was afoot, triggering the officer's legal right to stop and inquire *(see, supra,* at 215).

The suspects' lack of identification and evasive and misleading answers to his legitimate inquiries justified their continued temporary detention and the frisk for weapons which resulted in the seizure of the razor knife *(see, People v Hicks,* 68 NY2d 234, 238; *People v De Bour, supra).* The implausible explanation defendant and his companions gave for the possession of the articles retrieved from the riverbank may well have also justified the further temporary, nonarrest detention and transportation to the police station to clear up the matter of the rightful ownership of those items *(see, People v Hicks, supra,* at 240-242; *People v Martinez,* 133 AD2d 572, 573, *lv denied* 70 NY2d 957). We need not, however, place reliance on that rationale for upholding either the police acquisition of the stolen property on the bank of the river or the lawfulness of their transporting the three suspects to the police station. As to the bags and contents, the acts of defendant and his companions in throwing them away preceded any actual confrontation between them and the police and merely followed their observation of the movement of Biggs' police car back over the bridge in their direction. Therefore, the evidence supports County Court's finding of an abandonment *(see, People v Boodle,* 47 NY2d 398, 404, *cert denied* 444 US 969). The circumstances under which the police took defendant and the other suspects to the station house, namely, that no weapons were drawn, there was no full search, the individuals were not handcuffed and that the request to accompany the police was expressly for the limited purpose of clearing up the ownership of the retrieved articles found with the bags, all support County Court's additional finding that the suspects were not under arrest but voluntarily consented to go with the officers and that no arrest took place until Father Sipperly's positive identification *(see, People v Yukl,* 25 NY2d 585, 590-591, *cert denied* 400 US 851). The seizure of the religious

medal and cash was proper as an incident of that lawful arrest. It follows from the foregoing that all of defendant's objections concerning the admissibility of the stolen property are unavailing.

Defendant's alternative ground for reversal is that County Court's numerous *sua sponte* rulings limiting arguments and cross-examination by defense counsel and its repeated interruption of both direct and cross-examination of prosecution witnesses to ask questions deprived defendant of a fair trial. The court in a criminal trial is permitted to raise matters on its own initiative in order to elicit significant facts, clarify or enlighten an issue or to facilitate the orderly and expeditious progress of the trial *(People v Mendes,* 3 NY2d 120, 121). Nonetheless, excessive judicial intrusion upon the functions of counsel runs the danger of creating an unfair tactical advantage for one side *(People v Yut Wai Tom,* 53 NY2d 44, 57-58), or conveying the impression to the jury that the court has an opinion as to the credibility of a witness or the merits of an issue in the case *(People v Moulton,* 43 NY2d 944). While County Court would have been well advised to have played a less active role in the conduct of the trial of the instant case, our examination of the record as a whole persuades us that the intrusiveness of County Court did not result in a denial of defendant's right to a fair trial. In virtually all instances, County Court's objections were justified in curtailing repetitious interrogation or precluding the introduction of irrelevant matters into the trial. Many of the instances of County Court's questioning of witnesses were appropriate in order to clarify or to insure that a proper foundation was made for the introduction of photographs or other demonstrative evidence *(see, People v Yut Wai Tom, supra,* at 50). The bulk of County Court's initiatives were questions of that nature, and did not directly relate to crucially contested issues in the case. In effect, County Court's questions resulted only in a shortening of the process of introduction of evidence which ultimately would have been admissible had County Court not interfered. There were no instances where County Court engaged in acrimonious exchanges with defense counsel or entirely took over the significant portions of direct examination of the key prosecution witnesses *(cf., supra,* at 58-59). Moreover, there were also occasions, albeit rare, where County Court acted spontaneously to protect the record by rulings favorable to the defense *(see, People v Russo,* 41 NY2d 1091).

County Court, however, did clearly overstep the bounds of propriety in interrupting the cross-examination of Stukes as

to the leniency he was promised upon pleading guilty as a juvenile offender in return for his testimony against his coperpetrators. Eliciting that Stukes had only agreed to testify *truthfully* may have impaired the effectiveness of the cross-examination and served to bolster Stukes' credibility. However, any potential prejudice was at least partly cured by County Court's grant of defendant's request to charge the jury specifically on Stukes' credibility as affected by the plea agreement. In any event, neither this impropriety nor County Court's other intrusions in the trial were quantitatively or qualitatively as egregious as those condemned in *People v Yut Wai Tom (supra)* or those found not to have denied the defendants a fair trial in *Gayle v Scully* (779 F2d 802, *cert denied* 479 US 838) or *Daye v Attorney Gen. of State of N. Y.* (712 F2d 1566, *cert denied* 464 US 1048). The proof of defendant's guilt on evidence completely untainted by County Court's conduct was truly overwhelming, and the court's excesses did not, in our view, prevent the jury from arriving at an impartial judgment on the merits *(see, People v Moulton, supra,* at 946; *People v Congilaro,* 60 AD2d 442, 457). Our conclusion in this respect is reinforced by the fact that County Court's interjections were not once objected to by the two experienced defense counsel for defendant and Forant, whose representation of their clients at the trial was both vigorous and skillful.

We likewise find no merit to defendant's contention that his sentence was excessive. Therefore, the judgment should be affirmed in all respects.

Judgment affirmed. Mahoney, P. J., Weiss, Levine, Harvey and Mercure, JJ., concur.