[802 NYS2d 426]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ARMAND RETAMOZZO, Appellant.

First Department, October 18, 2005

### APPEARANCES OF COUNSEL

*Armand Retamozzo,* pro se, and *Edward M. Kratt,* New York City (*John R. Lewis* of counsel), for Armand Retamozzo, appellant.

*Robert M. Morgenthau, District Attorney,* New York City (*Grace Vee* of counsel), for respondent.

### OPINION OF THE COURT

McGUIRE, J.

The issue on appeal is whether the trial court deprived defendant of his constitutional right to a fair trial by excessive interference in the examination of witnesses.

At trial, Detective Vargas and other witnesses called by the People testified that on January 8, 2003 Vargas and a confidential informant met defendant in Washington Square Park. When Vargas asked to "see the pills," defendant, who was seated in a car, asked Vargas whether he had $7,500. Vargas replied that he did, but had to retrieve it from his car; after Vargas left, defendant drove off and returned a short time later with Bryant Shavuo. Shavuo removed a white plastic bag from the trunk of the car, which belonged to defendant's father, and placed the bag on the ground by the entrance to a nearby garage. According to Vargas, after a discussion between him and defendant about the pills and the money, defendant directed Vargas to stand on the sidewalk, where he was frisked by Shavuo. Following Vargas's inquiry about the "stuff," Shavuo gestured to the white plastic bag.

After Vargas again left the scene, Shavuo hid a clear plastic bag in nearby bushes. The arrest team then arrived and defendant was arrested, as was Shavuo, who discarded a clear plastic bag and attempted to flee. The clear plastic bag contained approximately 100 Ecstasy pills; the clear plastic bag hidden in the bushes contained approximately 600 Ecstasy pills and the white plastic bag contained approximately 300 Ecstasy pills. De-

fendant had $1,146 on his person, and a search of his car revealed $351, a digital scale, a beeper, his passport and two ziplock bags containing a white powder.

Defendant testified in his own behalf. At the time of his arrest he was a student at Nassau Community College, where he met Shavuo, a fellow student. They became casual acquaintances and socialized occasionally. Because they had similar class schedules, defendant gave Shavuo rides in the car owned by defendant's father. According to defendant, the day before he and Shavuo were arrested, Shavuo had offered to pay him $75 to drive him into Manhattan and back out to Nassau County. Defendant agreed, picked Shavuo up and the two drove to Washington Square Park. Shavuo had a red toolbox and backpack with him which he had placed on the floor of the car. After defendant parked, Shavuo walked off; defendant did not know where Shavuo was going or what he intended to do. Shortly thereafter, an acquaintance of Shavuo from a nightclub, the "Sound Factory," got into the car and asked for Shavuo. This man, who turned out to be the informant, was accompanied by another man; defendant was unsure if he was Detective Vargas.

After telling Shavuo's acquaintance that he did not know where Shavuo was, defendant told the man in response to his inquiry that he did not need to buy drugs and did not have any drugs on him. With that, the informant and the other man walked away.

Minutes later, Shavuo returned with the informant, and both men got into the car. At Shavuo's direction, defendant drove several blocks west. After the informant received a cell phone call from a man who was yelling and screaming, he asked defendant to drive him back to the park. When they returned, both Shavuo and the informant left the car, with Shavuo asking defendant to wait for him.

Several minutes later, the man who might have been Vargas returned, looked into the car and then left. Immediately thereafter, uniformed police officers arrested defendant and recovered $150 from his person; defendant did not have $1,146 on his person, there was no scale in the car and defendant did not know $351 was in the console of the car. Defendant's father, Donald Rozz, the owner of the car, testified that there was $1,300 in cash in the glove compartment. Rozz "always" kept at least such an amount of cash in the car to pay bills, but Rozz never told defendant about the money.

The People's case was strong, especially given the recovery of such a large quantity of Ecstasy pills, some $1,500 in cash and the digital scale. The accounts of defendant and his father (even if their demeanor favorably impressed the jury) certainly provided the prosecutor with a basis for challenging the plausibility of their testimony. However, although both "ghost" officers testified, neither heard any of the conversations between defendant and either the informant (who did not testify) or Vargas. And none of the People's witnesses testified that defendant physically possessed any of the bags of Ecstasy pills. Accordingly, the trial presented the jury with an overarching issue: the credibility of the testimony of Vargas and of defendant.

As defendant correctly argues, Vargas was the People's most important witness, because only he testified that defendant negotiated the price of the Ecstasy pills with him and no witness testified that defendant was in actual possession of the pills. During cross-examination of Vargas, counsel focused on the "Kel" device Vargas had been wearing. After establishing that the device transmits to the backup team so it can monitor the undercover officer's safety and that transmitted conversations can be recorded by the backup team with certain receivers, counsel asked Vargas whether anything had been recorded on January 8th. Vargas responded, "Not to my knowledge, no."

This legitimate line of questioning obviously was designed to ground an argument on summation that a lack of evidence on a key issue—due to the failure of the police to record and play for the jury a tape of the alleged negotiations—created a reasonable doubt.

Immediately after Vargas's answer, however, the trial judge interjected as follows:

"THE COURT: Beside[s], the Kels never work, right?

"THE WITNESS: That's true too."

This intervention was improper for numerous reasons. Although in form it was a question, in substance it was a declaration of an ostensible fact (Kels "never work"). Moreover, it was a declaration about an ostensible fact not only from an authoritative figure, but from someone who had neither been qualified as an expert to give an opinion on this supposed state of affairs relating to the Police Department's telecommunications equipment nor been sworn to tell the truth. In addition, this declaration was phrased in such a manner that the witness could dispute its accuracy only at the price of contradicting the judge. Nor was

there any need for the trial judge so to intervene, especially given that Vargas was the People's first witness.

If the trial judge had interrupted the cross-examination, stepped down from the bench, seated himself as a witness on behalf of the People and testified (without taking an oath or deeming himself an expert) that Kels "never work," the violation of defendant's constitutional rights to confront witness against him and to an impartial judge would be patent. This fanciful scenario, however, cannot be distinguished meaningfully from what actually occurred at trial. As discussed below, moreover, this was not the only instance in which the trial judge effectively testified in a manner favorable to the People's case on a nontrivial matter.

Just prior to this intervention, counsel sought to establish on cross-examination of Vargas that confidential informants commonly were individuals who were "working their way" out of trouble. That counsel would pursue this line of questioning is understandable, for the jury had already heard that the informant led Vargas to defendant. The following then occurred:

> "Q: But so these guys are for the most part are defendants, right?
>
> "A: Yes.
>
> "Q: Which means they are in trouble?
>
> "A: Either they are in trouble or they were in trouble.
>
> "Q: Either they are in trouble or they were in trouble?
>
> "A: Yes.
>
> "Q: If you say, if you put it in the past [t]ense they [have] made a deal that has gotten them out of trouble?
>
> "A: I guess so.
>
> "THE COURT: This is very, this whole area is very speculative." As defendant correctly argues, with this intervention the trial judge was not ruling the evidence admissible or inadmissible but was actually commenting before the jury on the quality of the evidence—the proper role of an advocate during summation.

Continuing, counsel asked Vargas if he personally knew the informant. When Vargas answered no, the following occurred:

"Q: You can't tell us anything about his character?

"A: I mean, he was a little nervous.

"THE COURT: No, he means what you know, his history, background, et cetera.

"THE WITNESS: No.

"THE COURT: No, he doesn't.

"Q: So you don't know how reliable the guy—

"[THE PROSECUTOR]: I object to this.

"THE COURT: The whole line is objectionable. Go ahead, finish it up." Absent a situation (not presented by this case) in which counsel persists in a line of questioning that the court has ruled improper, a trial judge should be circumspect about commenting unfavorably in the presence of the jury about what counsel is seeking to do.

Immediately after the trial judge's "question" about Kels "never work[ing]," counsel sought to defuse the court's intervention.

"Q: This is for your safety right, we're talking about something very important?

"A: Exactly.

"Q: They wouldn't send you out without with equipment that doesn't work, right?

"A: For the most part they do.

"Q: They send you out in situations where you can get killed or hurt or whatever?

"THE COURT: Why editorialize it here, just ask questions about the event."

Again, this line of questioning was proper and represented a legitimate effort to salvage some possibility that the jury might look askance at the notion that Kels "never work." But as defendant points out, what otherwise would be called impeachment was termed "editorializ[ing]" by the trial judge, thus devaluing if not denigrating before the jury his counsel's efforts to mount a

defense on the subject. The People argue that counsel's question was an objectionable "rhetorical" question that sought "to comment upon and exploit Vargas' testimony concerning the use of Kels." A pointed question is not an improper question, and counsel would have been remiss if he had not sought to test the plausibility of (i.e., exploit) Vargas's claim that the Police Department routinely placed officers in peril.

The People's second witness was Detective Peguero, one of the two "ghost" officers. On cross-examination, counsel established that Peguero lost sight of Vargas at one point and then questioned him as follows:

"Q: How do you protect a guy when you don't know where he is?

"A: He walked off, he wasn't on the set, he wasn't with the defendant, so I wasn't too, I knew that he wasn't in danger . . .

"Q: You don't know who is where, right?

"THE COURT: He just indicated the guy is off the set, he figured out of harm[']s way, that [is] what you are saying in effect?

"THE WITNESS: Yes, sir."

Of course, counsel was seeking to establish that if Peguero did not know where Vargas and defendant were, Peguero did not have an adequate basis for allegedly concluding Vargas was in no peril. But "in effect," the trial judge intervened to ratify the legitimacy of that conclusion. Even assuming that clarification of Peguero's testimony by the trial judge was appropriate at some point, this intervention was improper at this juncture. As defendant also correctly argues, there is no reason the trial judge could not have waited to see if the prosecutor did his job on redirect.

Detective Gonzalez, the other "ghost" officer, began his direct examination with testimony about both his training and, over defense counsel's objection, the hierarchy and roles of individuals involved in street sales of controlled substances. Although Gonzalez had barely begun his testimony on the latter subject, the trial judge intervened:

"THE COURT: In other[ ] words in the dope business, it's called a division of labor, different guys do different things?

"THE WITNESS: Yes, sir.

"THE COURT: And the persons or actors are intertwined, right?

"THE WITNESS: Yes, sir.

"THE COURT: Let's go."

To put it mildly, it would have been sufficient for the trial judge simply to have overruled the objection, rather than endorse the disputed testimony not only by a concise summary but by anticipatorily summarizing what the testimony would be.

Thereafter, Detective Gonzalez acknowledged on direct examination that he had listed in a police report Shavuo's height as 6 feet, 10 inches rather than 6 feet, 1 inch. When the prosecutor was part of the way through a leading question about an "extra zero" in Gonzalez's report, defense counsel objected. Rather than rule on the objection, the trial judge instructed the witness that "You don't have to explain it." Apparently (and understandably) satisfied with this instruction, the prosecutor began to ask a question on a different subject. The trial judge, however, interrupted and stated, "Unless he is 5-5, to him the guy is huge."

Again, the trial judge's statement was testimonial in nature. It was helpful to the prosecution, albeit on a matter less significant than the issue of the operability of Kels, was an instruction not on the law but on the mental state of the witness, and occurred during direct examination of the witness.

· Apparently trying to salvage some possibility that Gonzalez's report on Shavuo's height might inure to defendant's benefit, counsel turned to the report on cross-examination. After establishing that Detective Gonzalez was "now saying" that Shavuo was 6 feet, 2 inches tall, counsel asked "[s]o, that guy [Shavuo], . . . he is in the car?" Before the witness could answer, the trial judge intervened once again in a manner helpful to the prosecution. Without attempting to formulate a question, the judge declared, "Size is in the eye of the beholder." Of course, height is objective rather than subjective, and the trial judge had no business intervening on this issue in any event.

The digital scale the police officers testified they found in the trunk of defendant's car posed obvious problems for the defense. One count of the indictment, moreover, charged defendant with criminally using drug paraphernalia, a crime which required the People to prove defendant possessed the digital scale "under circumstances evincing an intent to use, or under circumstances

evincing knowledge that some person intend[ed] to use, the [scale] for purpose of unlawfully manufacturing, packaging or dispensing of any narcotic drug or stimulant" (*see* Penal Law § 220.50 [3]). Accordingly, on cross-examination of Gonzalez, counsel sought to minimize its significance by eliciting testimony that the police operation that day was an effort to buy a specific number of pills, not pounds or ounces of pills. The following then occurred:

"Q: So, that scale has nothing to do with those pills, right?

"THE COURT: Sustained, don't answer that question, sustained don't answer that question."

As the People recognize, the scale was relevant to defendant's guilt of the drug paraphernalia charge. But that offense required proof that defendant or someone else (to defendant's knowledge) intended to use it unlawfully, and counsel's question merely sought to elicit the concession that it could not play any role in the manufacturing, packaging or dispensing of Ecstasy pills, the sole controlled substance defendant was charged with possessing.

Gonzalez testified on direct examination to various events he observed relating to the interactions between defendant, Shavuo, Vargas and the informant. Counsel asked Gonzalez about the light at 5:00 P.M. that day in early January, and Gonzalez testified that it was dreary, "but you could see because the parking lot lights they were already on." Then:

"Q: We're talking about January 8th?

"A: Yes.

"Q: 5:00?

"A: Yes.

"Q: Right, the shortest day of the year is December 21st right?

"A: If you say so, sir.

"THE COURT: That is a trick question."

Counsel's relevant question on a matter of common knowledge was hardly a "trick question" and did not merit any reproach from the trial judge, let alone one that tended to portray counsel as tricky if not devious.

On a possibly less significant subject—the nature of a "rip" operation, one in which the police (as in this case) do not intend actually to purchase a controlled substance—the trial judge similarly intervened during counsel's cross-examination of Gonzalez.

> "Q: But there is no money so there is never going to be an actual buy?
>
> "A: Yes, sir.
>
> "Q: Right, so you are going out and you are kind of fooling the drug dealer?
>
> "THE COURT: Save that for summation, this fooling, all right, go ahead."

Counsel's question was a proper subject for cross-examination and did not warrant any judicial intervention, let alone intervention unprompted by an objection. Nor was there any basis for a comment that reasonably could have been interpreted by the jury as reflecting the judge's view that counsel was "fooling" around. Although the record does not reflect what counsel's purpose was, he well may have been seeking to establish a firmer evidentiary foundation for an argument on summation that the officers' experience and skills of deception were factors the jury should consider in assessing their veracity.

Although these and other instances of judicial intervention during the People's direct case were improper, the trial judge's interventions during the presentation of the defense case were perhaps more egregious. The trial judge first intervened just three pages into counsel's direct examination of defendant. Defendant testified that he and Shavuo were casual acquaintances, that he gave Shavuo rides "all the time" and explained that they had "classes about the same time" and "would play ping-pong and shoot pool" in the recreation center at the college. The trial judge then interrupted to ask the following question: "THE COURT: I thought you said you guys were ca[su]al and here you pick him up all the time?" We cannot know from the printed record what the trial judge's tone of voice was when he posed this question, and thus should assume it was neutral if not benign. But the content of the question could have communicated only that the trial judge was skeptical of defendant's testimony. As will be discussed below, moreover, trial judges must be particularly chary about posing any questions on direct

examination of a defendant; posing challenging questions, in any event, is the responsibility of the prosecutor on cross-examination. After defendant answered this question, the trial judge asked three more questions before counsel could resume his direct examination.

Two pages later, after defendant had testified that on the day before January 8th he agreed to Shavuo's request that he drive him into Manhattan in exchange for $75 and gas money, the trial judge interrupted again: "THE COURT: So you were like his chauf[f]eur on call, is that what you are saying?" Again, even assuming that the trial judge's voice betrayed no skepticism, the content of the question alone was sufficient to betray just that. Needless to say, nothing in defendant's testimony warranted attributing to him the position that he was a "chauffeur on call" for Shavuo. Regardless of whether the use of such an inherently sarcastic phrase would have been objectionable if it was used by the prosecutor on cross-examination, it was wholly improper and prejudicial for the court to employ it.

After answering the court's question, counsel elicited from defendant that January 8th was the first time he had given Shavuo a ride back into Manhattan. Counsel then asked, "So you gave him this ride?" Before defendant could answer, the court intervened again, just two questions and one answer after the last: "THE COURT: Wait a minute, how did this come about, how did he get [ ]hold of you to come in, you on call or what?" Again, regardless of intonation, the content of this intervention is sarcastic and blatantly so.

Some 10 pages later, after the trial judge interrupted the direct examination with eight more questions, defendant testified that after Shavuo and the man he later learned to be the informant left his car, the other man who might have been Vargas approached and looked into the car. He stood there a while and then left. Counsel asked, "Then what happened?" With that, the court interrupted yet again: "THE COURT: Excuse me, counsel, I don't like to interject, these guys leave[,] Shavuo and some other guy, they depart from your vehicle and you just sit there, you don't know when they are going or where they are going?" Even were we to assume that the trial judge's tone of voice was neutral, the content of the "question" reeks of skepticism. And the message communicated by the court's prefatory comment also is unmistakable: although the judge does not like to interject, he was compelled to interject because defendant's testimony was so questionable.

After defendant answered the court's question, counsel turned to other subjects. He elicited defendant's testimony about the arrest, that $150 was recovered from his pocket, he did not know whether other currency was recovered from the car, did not know anything about the scale, and did not know Shavuo was dealing drugs. Nor did defendant know that Shavuo went to the Sound Factory to dance; he had never seen Shavuo deal drugs there or anywhere else, and he did not know that Shavuo was in possession of drugs on January 8th. Counsel's last question asked defendant if he was working with Shavuo that day to sell 1,000 pills of Ecstasy. Defendant responded, "Definitely not, sir" and counsel stated he had "nothing further Judge."

Rather than direct the prosecutor to begin cross-examination, the trial judge posed the following questions:

> "THE COURT: I'll [sic] a little confused, there was an allusion here to $1,146 in cash taken from you, is that, did you have that kind of money on you?
>
> "THE WITNESS: No, Your Honor.
>
> "THE COURT: What about the $351 they claim they found in the consol [sic], you didn't have that on you either?
>
> "THE WITNESS: The best of my knowledge Your Honor, I had $150 around about.
>
> "THE COURT: Where?
>
> "THE WITNESS: In my front pants packet.
>
> "THE COURT: That's it?
>
> "THE WITNESS: Yes, sir.
>
> "THE COURT: The digital scale, you don't know anything about it being in the trunk of your car?
>
> "THE WITNESS: No knowledge, I know exactly what is in the trunk of my car, and, there were no scales in the trunk of my car. I know that for a fact.
>
> "THE COURT: In the Sound Factory there are lots of drugs being dealt there, you ever see that?

"THE WITNESS: To be perfectly honest, yes, there are, I had I did often see drug dealers there.

"THE COURT: All right."

In the first place, there was no evidentiary basis for the trial judge's confusion. Just three pages earlier defendant unequivocally testified he had only $150 on him, testified where it had been taken from and testified he did not know whether other currency had been recovered from the car. Right after that testimony, defendant just as unequivocally testified that he had never seen the scale before, had no reason to believe Shavuo was dealing drugs and had never seen him dealing drugs in the Sound Factory or anywhere else. Accordingly, assuming that the trial judge nonetheless somehow was confused, merely asking the first five of those questions created a risk that the jury might think they reflected judicial skepticism rather than confusion.

The sixth "question" was improper for the same reasons the trial judge's "question" asserting that Kels "never work" was improper. It was, however, even more improper of the trial judge to have posed this "question." After all, for defendant to contradict the court's authoritative assertion about the prevalence of drug dealing in the Sound Factory only could damage his credibility in the eyes of the jury. Agreeing with it, as defendant did, came at the price both of undermining his testimony that he had no reason to believe Shavuo was dealing drugs at the Sound Factory or anywhere else and of supporting the argument that defendant's presence at the Sound Factory was other than innocent.*

Not surprisingly, despite having just stated he had nothing further, counsel sought to undo the damage done and asked numerous questions eliciting testimony that drug activity was no more remarkable at the Sound Factory than at other nightclubs and that defendant went there not to engage in drug activity but to dance and have fun with girls.

Only after counsel effectively was compelled to reopen his direct examination did the prosecutor's cross-examination begin. Notably, the trial judge did not interrupt the prosecutor's examination of defendant with anything like the frequency with

---

* In his summation the prosecutor argued that the defendant "goes to Sound Factory every weekend and he meets them [Shavuo and the informant] but he doesn't know what they are involved in." Here, of course, we need not indulge the assumption that the prosecutor's tone was neutral.

which the court interrupted defense counsel's cross-examination of the People's witnesses. One particular interruption by the court, however, warrants mention. The prosecutor elicited from defendant that although he had been to Shavuo's house two or three times he only entered it once and did not know with whom Shavuo lived. The following then occurred:

"Q: Did he ever tell you who he lived with?

"A: He never told me, I never asked.

"THE COURT: Wait a minute, you drive with this guy for an hour into Manhattan, you never, he never talked to you about whether he has a wife or an old lady, if he has kids, none of that, you don't know anything about this guy's background?"

Even if the court had not professed its aversion to interjecting, and even assuming anew that the court's tone was neutral, this question, too, could have communicated to the jury only that the court viewed defendant's testimony with considerable skepticism.

The governing law is clear. As the Court of Appeals stated in *People v Yut Wai Tom* (53 NY2d 44, 57-58 [1981]):

"We have recognized the Trial Judge's vital role in clarifying confusing testimony and facilitating the orderly and expeditious progress of the trial but noted that the power is one that should be exercised sparingly. A Trial Judge's examination of witnesses carries with it so many risks of unfairness that it should be a rare instance when the court rather than counsel examines a witness. For example, where the court elicits crucial incriminating testimony on direct examination, the witness may be less likely to change his testimony on cross-examination. There is an increased risk that the Trial Judge will inadvertently convey to the jury his disbelief of a witness, not only by his reaction to answers, but by his phrasing of questions and tone of voice. . . . Even worse . . . the judicial questioner may in the guise of clarifying testimony, conduct what amounts to a running redirect examination during defense counsel's cross, thereby rendering it ineffective. . . . In short, the risks of unfairness are so many and potentially so great that the Judge should rarely, if ever, indulge in an extended

questioning of the witnesses for either side." (Citations omitted.)

Although we have set forth above most of the improper interventions by the trial judge, there were others. Moreover, there were many other questions asked by the trial judge and, as *Yut Wai Tom* makes clear, even proper questions from trial judges present significant risks of prejudicial unfairness, particularly when the trial judge "indulge[s] in an extended questioning" of witnesses (*id.* at 58). Moreover, the People do not cite in their brief a single instance of a question asked by the trial judge that plausibly could be viewed as helpful to the defense; nor could they for there were none.

As the Second Circuit has stated, "[i]t is 'clear error for a trial judge to ask questions bearing on the credibility of a defendant-witness prior to the completion of direct examination' " (*United States v Filani*, 74 F3d 378, 387 [2d Cir 1996], quoting *United States v Victoria*, 837 F2d 50, 55 [2d Cir 1988]). Here, the trial judge repeatedly asked precisely such questions during counsel's direct examination of defendant. That is not to say that every one of the judge's questions during defendant's direct examination bore on his credibility. Many if not most, however, did. And as *Yut Wai Tom* makes plain, extended questioning by the trial judge of *any* witness is at best perilous. Of the 147 some questions posed to defendant on direct examination, the trial judge asked nearly 15%.

In *Yut Wai Tom*, "the most prejudicial conduct of the Trial Judge . . . was his constant interruption of defense counsel's cross-examination to ask questions which would only be proper as redirect examination if asked by the prosecutor" (*Yut Wai Tom*, 53 NY2d at 59). Here, the trial judge committed the same prejudicial conduct during defense counsel's cross-examination, exacerbated that prejudicial conduct by essentially testifying on behalf of the People on a significant issue (the operability of Kels) and gave relative free rein to the prosecutor during cross-examination of both defendant and his father. With respect to the Kels in particular, but in other respects as well, the court intervened during defense counsel's cross-examination with "follow-up questions that entirely demolished the helpful concession defense counsel had elicited from a prosecution witness" (*Filani*, 74 F3d at 382). We need not decide whether the trial judge's "most prejudicial conduct" was committed during his "constant interruption of defense counsel's cross-examination" or his "constant interruption of defense coun-

sel's" direct examination of defendant (*Yut Wai Tom*, 53 NY2d at 59).

With respect to the latter interruptions, however, *Filani* again is instructive. Here, as in *Filani*, "we need not make any inferences concerning the [trial] court's tone to recognize that these inquiries targeted the defendant's credibility and challenged his story more in the manner of a prosecutor than an impartial judge" (*Filani*, 74 F3d at 385). Here, too, as the court went on to state: "Inevitably the court's elicitation of [defendant's] testimony led the jury to doubt his veracity. We have ruled that where 'such doubt is injected by the court in a case where credibility of a defendant-witness is a key issue, there has been a deprivation of a fair jury trial.' " (*Id.*, quoting *United States v Victoria*, 837 F2d at 55.)

As the People correctly argue, no objection was raised at trial by defendant to any of the trial judge's interventions. Accordingly, defendant's judicial misconduct claim is not preserved for appellate review (*see* CPL 470.05 [2]; *Yut Wai Tom*, 53 NY2d at 54-56). As the Court of Appeals recognized, defense counsel is not relieved of the obligation to object even though "the greater the Trial Judge's penchant for participation in the questioning of witnesses, the more difficult will it be for counsel to register objection to the Judge's conduct for fear of antagonizing him" (*id.* at 55). Given the magnitude of the deprivation of defendant's right to a fair trial in this credibility case, we review defendant's claim in an exercise of our interest of justice jurisdiction. We note in this regard that the only apparent strategic reasons for defendant not to object were to avoid antagonizing the trial judge and to avoid greater damage. Voicing an immediate objection when the trial judge intervenes to elicit damaging testimony can be tantamount to declaring "touché" before the jury. Defendant should never have been placed so persistently and pervasively in this position. Thus, reviewing defendant's claim in the interest of justice does not present any danger of encouraging the kind of "have-your-cake-and-eat-it-too" gamesmanship that the contemporaneous-objection requirement is designed to prevent.

We are mindful of the People's argument that the trial judge instructed the jury that it was "not to consider anything [the court] may have said during the trial" or "any questions [the court] may have asked" as "any kind of indicia that [the court] ha[d] an opinion on this case one way or the other," and that it had "no opinion whatsoever." Ordinarily, juries are presumed to

follow the court's instructions on the law (*see e.g. People v Davis*, 58 NY2d 1102, 1104 [1983]). We cannot take comfort from this principle when a trial judge so consistently compromises the reality and appearance of judicial impartiality that supports such a presumption.

Finally, with the recovery of both the large quantity of Ecstasy pills and a large sum of money, and with the testimony about Shavuo's conduct, the People's case was a strong one. The strength of the People's case, however, and the implausibility of at least some of the testimony of defendant and his father, also underscore the gratuitous nature of the trial judge's repeated interventions. At bottom, this was a case where the "credibility of a defendant-witness [was] a key issue," and the trial judge's conduct deprived defendant of his right to have the jury resolve that issue in a fair trial presided over by a fair and impartial judge.

Accordingly, the judgment of the Supreme Court, New York County (Edwin Torres, J.), rendered April 28, 2004, convicting defendant, after a jury trial, of criminal possession of a controlled substance in the second and third degrees, and sentencing him to concurrent terms of 3 years to life and 1 to 3 years, respectively, should be reversed, on the law and as a matter of discretion in the interest of justice, and the matter remanded for a new trial before another justice.

MAZZARELLI, J.P., ANDRIAS, ELLERIN and GONZALEZ, JJ., concur.

Judgment, Supreme Court, New York County, rendered April 28, 2004, reversed, on the law and as a matter of discretion in the interest of justice, and the matter remanded for a new trial before another justice.