[815 NYS2d 551]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FELIX
MELENDEZ, Appellant.

First Department, June 1, 2006

APPEARANCES OF COUNSEL

*Robert S. Dean, Center for Appellate Litigation,* New York City (*Barbara Zolot* and *Lisa Joy Robertson* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney,* New York City (*Susan Axelrod* of counsel), for respondent.

## OPINION OF THE COURT

Per Curiam.

On this appeal from his conviction of criminal sale of a controlled substance in the third degree and criminal possession of a controlled substance in the third degree as well as a related offense, defendant raises a number of issues, only one of which—that the trial court's improper intervention in the trial by extensive questioning of witnesses and interference with cross-examination deprived him of a fair trial—causes us any concern. The conviction arises out of defendant's participation in an observation sale and in his accessorial possession of the drug stash, which provided the source of the drugs that were sold.

The People's lead and, as it developed, key witness was Police Officer Daniel Keane, who, using binoculars, conducted the rooftop surveillance that captured defendant's involvement in the sale and related events and led to his arrest. On the afternoon of February 6, 2003, Keane, part of a team assigned to observe narcotics activity in upper Manhattan and to make arrests based thereon, had observed defendant and his codefendant, Jose Valdez, speak with Jose Luna, after which, defendant walked to a truck parked in a nearby lot and removed an object about one-half-inch thick that he handed to Valdez. Valdez, in turn, handed a white object, a portion of what he had just received from defendant, to Luna in exchange for money. Shortly thereafter, the field team stopped Luna and recovered three glassine envelopes containing heroin. As Keane continued to watch, he observed Eric Meier approach, speak briefly with Valdez and then hand him money. Valdez then placed a white object on a parked car and walked away. Meier removed the white object and left the scene. When stopped by the field team, Meier swallowed the object. As a result, the sale to Meier was never charged. The team then returned to where Valdez and defendant were still standing and arrested both of them. One of the

officers searched the truck and removed 10 glassine envelopes of heroin and an envelope of cocaine from the dashboard.

Shortly into Keane's direct examination, the court interjected and virtually took over. After it elicited Keane's position on the roof—closest to 122nd Street and Lexington Avenue—the site of the transaction, the following, illustrative of the court's pervasive interference, transpired:

"THE COURT: . . .You got up to the roof at what time?

"THE WITNESS: Approximately 12:40.

"THE COURT: Did somebody accompany you to the roof?

"THE WITNESS: Yes, Officer Toban. . . .

"THE COURT: Tell the jurors what happened next. You got to the roof, where you went, what you did. How did you get to the roof? . . .

"[PROSECUTOR]: Officer, I'd like to direct your attention now to East 122nd Street between Lexington and Third—

"THE COURT: Wait one second. I want to go back to the roof because I missed something.

"You went up to the roof at 12:40 and where did you go on the roof, you?

"THE WITNESS: I went to the front edge—the corner of the building that would be closest to 122nd Street and Lexington Avenue.

"THE COURT: Were you on a corner, were you on a side? Where exactly were you?

"THE WITNESS: It was the corner of the roof.

"THE COURT: You were actually at the corner?

"THE WITNESS: Correct.

"THE COURT: What two streets would intersect there?

"THE WITNESS: East 122nd Street and Lexington Avenue.

"THE COURT: Okay. And could you—just so I understand, is that the southeast corner, southwest?

"THE WITNESS: It was the southwest corner of that intersection.

"THE COURT: You were on the southwest corner and around 12:40, were you looking generally or what is the first thing you did? Did you take out your binoculars? Tell the jurors what you did up there, slowly.

"THE WITNESS: I took out my binoculars and observed 122nd Street between Lexington and Third Avenue.

"[PROSECUTOR]: At 11:10 P.M.—

"THE COURT: No, it's not necessary. Step up, again.

[BENCH CONFERENCE HELD] . . .

"THE COURT: Okay, go ahead, Mr. [PROSECUTOR].

"[PROSECUTOR]: Officer, I direct your attention now to ten minutes later, about 12:50 P.M., while you were on that roof, please tell the members of the jury what you observed.

"THE COURT: I just want to go back a moment. You're up there, what's going on?

You're up there, tell us what you're seeing, what are you watching, tell the jurors.

"THE WITNESS: Well, I'm watching the street at that time and approximately ten minutes later, I observed a gentleman who was later identified as Jose Luna loitering about on 122nd Street and Lexington Avenue.

"THE COURT: Rather than give the names right now, which is not too important, what did you see when you say you saw a person? What drew your attention to that person? Was he the only person on the block or what happened? Tell the jury.

"THE WITNESS: There was pedestrian traffic moving, but he was just standing around. Where he was standing, there was no businesses, what appeared to me to be no apparent reason. Shortly after—

"THE COURT: He was standing there, so did you begin to watch this person?

"THE WITNESS: I began to watch him, yes.

"THE COURT: Could you describe this person in terms of race, height, what he was wearing to the jurors. Take your time.

"THE WITNESS: Mr. Luna was a male Hispanic. He was wearing a dark leather jacket, blue jeans, a black skull cap with a white stripe.

"[PROSECUTOR]: Where did you observe him go from that corner?

"THE WITNESS: Shortly after I noticed him, I watched him cross over to the south side of 122nd Street, just off Lexington Avenue, and engage in a conversation.

"[PROSECUTOR]: And who was he talking with?

"THE WITNESS: He was walking [*sic*] with two gentlemen who were later identified as Felix Melendez and Jose Valdes [*sic*].

"[PROSECUTOR]: Where were these three men standing?

"THE WITNESS: On the south side of 122nd Street between Lexington and Third Avenue.

"[PROSECUTOR]: And is there a parking lot—

"THE COURT: Wait a second. You want to describe these two men, too, if you can, as to race, height, weight? Tell the jurors what they look like. You said two people, tell them.

"THE WITNESS: Mr. Melendez was a heavy set male Hispanic. He was wearing blue jeans, a blue puffy jacket and a blue Indianapolis Colts hat with a white horseshoe on it.

"Mr. Valdes [*sic*] was wearing a dark leather jacket, tan slacks and a black hat.

"THE COURT: You said you thought they were together, like in a group, these three people?

"THE WITNESS: Mr. Melendez and Mr. Valdes [*sic*] arrived on the block. As soon as they arrived, Mr. Luna went over, approached them and engaged them in the brief conversation.

"[PROSECUTOR]: This is in front of a parking lot?

"THE WITNESS: That's correct, in front of a large lot.

"THE COURT: Who arrived on the block?

"THE WITNESS: When Mr. Valdes [*sic*] and Melendez arrived on 122nd Street, Mr. Luna approached the two of them and they all began a brief conversation.

"THE COURT: You mentioned a Mr. Melendez? I didn't hear that earlier. What was Mr. Luna wearing again?

"THE WITNESS: Luna was wearing a dark leather jacket, blue jeans, black skull cap with a white stripe.

"THE COURT: You mentioned Mr. Melendez.

"Did he describe Mr. Melendez?

"[PROSECUTOR]: I believe he did.

"THE COURT: All right. Could you do that again? I missed it.

"THE WITNESS: Sure. Mr. Melendez was a heavy set male Hispanic, blue jeans, a blue puffy winter type jacket and a blue baseball cap with a white horseshoe on it, Indianapolis Colts.

"THE COURT: Did you say somebody else came on the street?

"THE WITNESS: Mr. Valdes [*sic*] was also there.

"THE COURT: Did you describe him?

"THE WITNESS: Yes, I did.

"THE COURT: Mr. Valdes [*sic*] was where in relation to these two men?

"THE WITNESS: Mr. Valdes [*sic*] and Melendez arrived on the block together. Mr. Luna had been across the street, appeared to be waiting—

"[DEFENDANT'S COUNSEL]: Objection, Your Honor.

"[CODEFENDANT'S COUNSEL]: Objection.

"THE COURT: I'll strike 'appeared to be waiting', but when did you first observe Mr. Luna, what time?

"THE WITNESS: Approximately 12:50.

"THE COURT: When did the other two men arrive on the block, what time?

"THE WITNESS: Approximately a couple of minutes later. Couldn't have been more than two or three minutes.

"THE COURT: Then what happened after that?

"THE WITNESS: After that, Mr. Luna approached Mr. Valdez and Mr. Melendez.

"THE COURT: Where are they now?

"THE WITNESS: On the south side of 122nd Street.

"THE COURT: You're on the south side also?

"THE WITNESS: Correct.

"THE COURT: So you're looking to your right?

"THE WITNESS: I'm looking straight ahead, down 122nd Street.

"THE COURT: Now you're facing, the corner of the building is facing 122nd?

"THE WITNESS: Correct.

"[PROSECUTOR]: Was anything blocking your view, officer?

"THE WITNESS: No.

"[PROSECUTOR]: After you observed the three men conversing on the sidewalk, what did you observe occur next?

"THE WITNESS: After that conversation took place, Mr. Melendez stepped away from the two and entered a lot that they were standing in front of, a large fenced in lot on 122nd Street.

"[PROSECUTOR]: What did you observe?

"THE COURT: Just what happened next."

At this point, the prosecutor resumed the questioning of the witness. Less than two transcribed pages of testimony later, after the prosecutor elicited from the officer that he transmitted a description of Luna to the apprehension team, the court again interrupted:

"THE COURT: Wait a second. Could you tell the jurors what you transmitted?

"THE WITNESS: After I saw Mr. Luna receive the object and walking away, I made a radio transmission to the apprehension team.

"THE COURT: What [d]o you recall exactly what you said or in substance?

"THE WITNESS: In substance, I gave them a physical description.

"THE COURT: Tell them.

"THE WITNESS: Which was a male Hispanic with a black skull cap with a white stripe, dark leather jacket and blue jeans."

Officer Keane expounded on his response to the court's question, explaining the substance of his radio transmission. Then, in response to the prosecutor's questions, he explained that he saw another officer, Officer Matone, apprehend Luna and take him around the corner. After one more question by the prosecutor, the court interjected to elicit again that Keane had observed Matone apprehend Luna and take him around the corner.

Subsequently, the prosecutor asked a single question, eliciting that, at this point, Officer Keane observed Eric Meier approach Valdez. The court then elicited all the facts pertaining to the uncharged sale to Meier:

"THE COURT: When was the first time you noticed this man that you're calling Mr. Meier; when did you first see him?

"THE WITNESS: I brought my attention back to 122nd Street, Mr. Meier was there.

"THE COURT: Where was he?

"THE WITNESS: A step or two away from Mr. Valdez. They engaged in conversation.

"At that point Mr. Meier handed Mr. Valdez a sum of U.S. currency.

"Mr. Valdez took that currency and walked away from Mr. Meier, a few steps, and approached a parked vehicle on the south side of 122nd Street. It was a dark car.

"Mr. Valdez put a small white object on the hood of that dark car and walked away.

"Mr. Meier followed behind him and took up that object and walked off eastbound on 122nd Street towards Third Avenue. . . .

"THE COURT: . . . So, this man walked off, what direction did he go?

"THE WITNESS: East on 122nd Street towards Third Avenue.

"THE COURT: What did you do?

"THE WITNESS: I made a radio transmission to the apprehension team describing Mr. Meier.

"THE COURT: What did you tell them? Do you remember what you said?

"THE WITNESS: In substance, I told them that he was a male white with a tan skull cap, black jacket and gray slacks, walking eastbound on 122nd Street towards Third Avenue.

"THE COURT: What happened next, tell the jury?

"THE WITNESS: When he hit Third Avenue I saw him make a left and I informed the apprehension team that he was going north on Third Avenue on the west side of the street and I received another radio transmission back stating we got him. . . .

"THE COURT: Just stop a minute.

"What did you say—you say you learned his name was what?

"THE WITNESS: Identified as Eric Me[i]er.

"THE COURT: Where did you say he was going?

"THE WITNESS: Walked towards Third Avenue, made a left on Third Avenue walking north.

"THE COURT: Did you lose sight of him then?

"THE WITNESS: Yes.

"THE COURT: You radioed your field team?

"THE WITNESS: I had already radioed the field team, they informed me that they had him in sight.

"THE COURT: Did somebody radio back from the field team?

"THE WITNESS: Yes.

"THE COURT: What did you do next?

"THE WITNESS: At that point, I brought my attention back to Mr. Melendez and Mr. Valdez."

The prosecutor elicited from the witness that he made a second transmission to the apprehension team concerning a description of defendant and Valdez. The court then took over, asking, "Do you recall what you said?" The witness again reiterated the detailed description of the men and their clothing, and explained, prompted by the court to give specifics, his observation of defendant's apprehension by other officers.

In response to a few questions by the prosecutor, the witness described that he observed the apprehension team stop and search defendant and Valdez, and that he then instructed Officer Matone to search the truck inside the lot. But the court almost immediately redirected the questioning to elicit additional information concerning what Officer Keane observed following his descent from the roof—which officers were still at the location, the whereabouts of Officer Matone, and how soon after defendant's arrest he saw Matone again.

The court demonstrated the same extensive level of interference in the questioning of the other police witnesses. It also asked the essential questions to lay the foundation for the admission of the People's exhibits relating to the drugs, the three glassine envelopes recovered from Luna and the 10 glassine envelopes of heroin and the bag of cocaine recovered from the truck.

In the cross-examination of Officer Matone, counsel asked when the witness had first observed defendant. The officer clearly understood the question to refer to his initial observation of defendant that day, and no other, and answered accordingly. The court, however, for no explicable reason, interjected its own question, thereby inviting an answer that implied a prior police encounter:

"THE COURT: So, when is the first time you say you saw this man who you have identified as Mr. Melendez; when was the first moment you saw him in time, ever in your life?

"THE WITNESS: The first time I ever saw him in my life?

"THE COURT: Yes.

"THE WITNESS: I seen him prior to—

"THE COURT: On this day."

The court thereafter denied counsel's motion to strike this response, and continued to interrupt counsel's cross-examination, directing its own set of questions to the witness. At the conclusion of cocounsel's cross-examination of Officer Matone, defense counsel moved for a mistrial on the ground, among others, that the court had been trying the case for the prosecutor, had been interfering with counsel's examination of the witnesses and had interfered with everyone's direct and cross-examination. Cocounsel joined in the motion, which was denied.

It goes without saying that the role of a trial judge in a criminal case is "not merely that of an observer or even that of a referee enforcing the rules of a game" (*People v Moulton*, 43 NY2d 944, 945 [1978]). Nor does the guarantee of a fair trial "inhibit a Trial Judge from assuming an active role in the resolution of the truth" (*People v De Jesus*, 42 NY2d 519, 523 [1977]). A trial judge may act "to keep the proceedings within the reasonable confines of the issues and to encourage clarity rather than obscurity in the development of proof" (*Moulton,* 43 NY2d at 945). And, while a trial judge retains discretion to question witnesses in order to clarify testimony and expedite the progress of the trial, and, if necessary, to develop factual information (*see People v Yut Wai Tom*, 53 NY2d 44, 55-57 [1981]; *People v Hinton,* 31 NY2d 71, 76 [1972], *cert denied* 410 US 911 [1973]), it is equally important that a judge be guided by the principle that his/her role is "to protect the record at trial, not to make it" (*People v Arnold*, 98 NY2d 63, 67 [2002]; *see also De Jesus,* 42 NY2d at 523 ["care should be assiduously exercised lest the Trial Judge's conduct, in the form of words, actions or demeanor, . . . itself become an irrelevant subject of the jury's focus"]). In that regard, it is the "substance and not the number of questions asked [that] is the important consideration" (*Yut Wai Tom,* 53 NY2d at 58). What is impermissible is when a judge "takes on either the function or appearance of an advocate

at trial" (*Arnold,* 98 NY2d at 67). Finally, even if a trial judge engages in unduly extensive questioning of witnesses, the accused is not deprived of a fair trial as long as the jury is "not prevented from arriving at an impartial judgment on the merits" (*Moulton,* 43 NY2d at 946; *see also People v Russo,* 41 NY2d 1091 [1977]).

Applying these principles to the extensive and unnecessary questioning that occurred here, defendant is not entitled to a reversal. Contrary to his claims, the trial court did not become an advocate for the People or usurp the role of the prosecutor or defense counsel (*see e.g. People v Mees,* 47 NY2d 997, 998 [1979]). While the court did extensive questioning of the People's witnesses, it was the prosecutor and not the court who steered the direct examination. For instance, it was the prosecutor who began questioning Officer Keane about his education and professional experience, thereafter eliciting his assignment on the day in question and the identity of his team members. He then asked the witness about the location of the observation post. At one point, when the court began to ask a question about Keane's observations, the prosecutor noted that he had not completed his preliminary questions and that he intended to elicit from the witness the type of equipment that he was using. The court allowed the prosecutor to ask these questions and then inquire as to what happened once Keane arrived at the rooftop post. While the court did ask additional questions as to where Keane was situated on the roof and his observations of the street activity, the prosecutor was able to elicit the details of defendant's retrieval of the drug supply from the white truck, how he handed the supply to Valdez and how Valdez then consummated the sale with Luna. This was the heart of the People's case. The prosecutor similarly directed the examination of the other witnesses.

It is unfortunate that the court could not resist the temptation to take over the examination of the witnesses in order to flesh out the details of each subject introduced by the prosecutor. But, there is no basis to charge the court, in its questioning, with assisting the People in proving their case or benefitting them in some fashion. In fact, the court precluded the prosecutor from eliciting certain information sought to be placed before the jury. And, while the court did ask questions that would have been better left for the prosecutor, it cannot be said, on this record, that it took on the appearance of an advocate for the People (*see Arnold,* 98 NY2d at 67). Nor, except for the question of Of-

ficer Matone as to the first time he ever noticed defendant, did it improperly interfere with the cross-examination of the People's witnesses. As to that interaction, suffice it to say, as this Court has held, a police officer's statement that he had seen a defendant on an earlier occasion, without more, does not cause prejudice since it is not evidence of a prior crime (*see People v Correa*, 16 AD3d 355 [2005], *lv denied* 5 NY3d 787 [2005]; *People v Jiminez*, 300 AD2d 77 [2002], *lv denied* 1 NY3d 574 [2003]).

Since we are not persuaded, based on a "review of the record as a whole" and given the overwhelming proof of defendant's guilt, that the jury was "prevented from arriving at an impartial judgment on the merits" (*Moulton*, 43 NY2d at 946), there is no basis to overturn the verdict.

This is not to say, however, that we should turn a blind eye to the trial judge's overly intrusive involvement in the questioning of witnesses and undue interference in the orderly presentation of proof in the trial of a criminal case. We have had occasion to observe, in other cases involving the same Justice (*People v Robles*, 26 AD3d 177 [2006], *lv denied* 6 NY3d 837 [2006]; *People v Straniero*, 17 AD3d 161 [2005], *lv denied* 5 NY3d 795 [2005]; *People v Thompson,* 8 AD3d 213 [2004], *lv denied* 3 NY3d 742 [2004]; *People v Moore*, 6 AD3d 173 [2004], *lv denied* 3 NY3d 661 [2004]; *People v Robinson*, 3 AD3d 404 [2004], *lv denied* 2 NY3d 765 [2004]), her extensive examination of witnesses, which seemingly stems from an inability to accept the possibility that there is more than one way, her way, to examine a witness.

In the final analysis this abuse of the judicial function hurts the prosecution more than the defense since it occurs most frequently on direct examination and, for the most part, the People, as in this case, call most, if not all, of the witnesses. The key to any direct examination is to have the jury focus its attention exclusively on the witness, not the examiner. That goal is completely frustrated by the overly intrusive questioning of a witness by a trial judge. Not only is the pace and orderly presentation of evidence disrupted and fragmented, but subtle yet significant evidentiary detail and nuance may be lost. While reversal is not, in the absence of prejudice to a defendant, the remedy, such injudicious conduct should not go unaddressed. The trial judge would do well to heed our criticism.

The portions of the prosecutor's summation to which defendant objected as "vouching" were responsive to the defense

summations and fair comment based upon the evidence (*see People v Overlee*, 236 AD2d 133 [1997], *lv denied* 91 NY2d 976 [1998]). Defendant's other challenges to the People's summation are unpreserved and we decline to review them in the interest of justice. Were we to review these claims, we would likewise reject them. We have examined defendant's other claims and find that they are without merit.

Accordingly, the judgment of the Supreme Court, New York County (Arlene R. Silverman, J.), rendered December 9, 2003, convicting defendant, after a jury trial, of criminal sale of a controlled substance in the third degree and criminal possession of a controlled substance in the third and seventh degrees, and sentencing him, as a second felony offender, to concurrent terms of 4½ to 9 years on the felony convictions and 90 days on the misdemeanor conviction, should be affirmed.

SAXE, J.P., MARLOW, SULLIVAN, GONZALEZ and CATTERSON, JJ., concur.

Judgment, Supreme Court, New York County, rendered December 9, 2003, affirmed.