OPINION OF THE COURT
Andrias, J.
Defendant was accused of firing shots into a car, killing two of the occupants and seriously injuring a third. A second gunman was not apprehended. The theory of the defense was that de *106 fendant was an innocent bystander who was misidentified by two police officers to cover their miscue after they mistakenly shot and wounded him when they arrived at the scene after the shooting. Following two mistrials in which the juries were unable to agree on a unanimous verdict, defendant was convicted of murder in the first and second degrees, attempted murder in the second degree, and criminal possession of a weapon in the second and third degrees.
Defendant’s argument that the trial court intervened excessively during the questioning of the People’s gunshot residue experts, FBI analyst Cathleen Lundy and private examiner Alfred Schwoeble, who linked a denim jacket worn by defendant to a 9 millimeter semiautomatic handgun used in the shooting, is not preserved (CPL 470.05 [2]; see People v Charleston, 56 NY2d 886 [1982]; People v Whitecloud, 110 AD3d 626 [1st Dept 2013]; People v Rios-Davilla, 64 AD3d 482 [1st Dept 2009], lv denied 13 NY3d 838 [2009]), and we decline to review it in the interest of justice. No objections to the court’s conduct were raised by defendant at trial. As an alternative holding, we find no basis for reversal. The prosecution’s case, which included a police identification that was corroborated by other eyewitness testimony and forensic and circumstantial evidence, was extremely strong, and the trial court’s interventions, even where imprudent, did not prevent the jury from reaching an impartial verdict based upon the evidence presented.
At the month-long trial, Officer Peter Anselmo and his partner, Officer Edward Polstein, testified that they were canvassing an area in an unmarked police van, with a witness to a unrelated crime, when they heard shots. As they approached the intersection of West 26th Street and 10th Avenue, the officers saw two black males firing handguns into a green car. One was on the driver’s side, and the other was on the passenger’s side. Both wore dark clothing, and the driver’s-side shooter was wearing a baseball cap. This testimony was corroborated by the witness who had been canvassing with the officers, who testified that there were two men shooting into the green car when the police van turned onto 10th Avenue and that one of the shooters was wearing dark jeans and a coat, with something on his head.
Anselmo and Polstein testified that they exited the van and yelled, “Police, stop.” Defendant turned toward the officers and raised his arm as if he were pointing a weapon at them. In response, the officers fired their weapons at defendant, who (ac *107 cording to Anselmo) initially fell, but then continued running along West 26th Street and across 9th Avenue into a New York City housing project. This testimony was corroborated by a resident of a building on West 26th Street, who testified that one of the two men turned and pointed a gun at the officers, and that the two men, both of whom were wearing dark clothing, ran away after the officers fired their weapons.
Anselmo testified that as he and Polstein pursued the perpetrators, Polstein fell and hurt his knee, and thus was not able to continue the direct pursuit. This testimony was corroborated by another resident of a building overlooking the scene, who testified that she was awakened by gunfire and saw two men followed by a police officer running along 26th Street towards the Hudson Guild Community Center.
After losing sight of the shooters for a few seconds, Anselmo saw defendant’s accomplice move his hand as if to help defendant remove his jacket, under a lamppost by a chain link fence near the Hudson Guild.* Defendant looked toward Anselmo and threw something behind an iron fence. This testimony was corroborated by an independent eyewitness who saw two men running through the Hudson Guild area and saw one of them struggling to remove his jacket.
Officer John DiCarlantonio, responding to a radio transmission, came over to Anselmo, who pointed out defendant, who was running out of the housing project. DiCarlantonio followed, and repeatedly shouted at defendant to stop, but defendant continued north on 10th Avenue. After DiCarlantonio tackled him, Anselmo identified defendant, who was bleeding from his wounds, as the one who had pointed a gun at him, and noted that his hat distinguished him from his accomplice. When Pol-stein arrived at the scene of the arrest, he recognized defendant’s dark clothing, and noticed a baseball cap on the ground.
Anselmo retraced his route and observed a trail of blood. He located a black denim jacket right over the fence from where he had seen defendant and his accomplice throw something; the jacket was processed by the Crime Scene Unit. A medical examiner conducted DNA tests of the blood taken from the trail on the street, the cap, the denim jacket, and the clothing de *108 fendant was wearing at the hospital. The testing revealed that all samples came from defendant.
Detectives recovered two handguns on the street near the intersection of 26th Street and 10th Avenue, a 9 millimeter Glock semiautomatic and a .40 caliber Glock semiautomatic. A total of 30 shell casings were found near the victims’ car; 18 were 9 millimeter, and 12 were .40 caliber. Consistent with Anselmo’s testimony, most of the 9 millimeter casings were on the driver’s side, and most of the other casings were on the passenger’s side.
After the first trial, FBI analyst Lundy conducted the first gunshot residue tests of the denim jacket and of the two handguns recovered by the police. A year later, private examiner Schwoeble conducted a second examination. Both experts concluded that based on the amount of tin particles on the objects, which were not typically found on ammunition manufactured by American companies, it was likely that the person who wore the jacket (defendant) also fired the 9 millimeter handgun or was standing next to someone who did so. Schwoeble rejected the possibility that the tin particles found on the jacket resulted from cross-contamination after the jacket had been spread out by police on the precinct’s muster room floor, since the tin was found on the front of the jacket, and the jacket was spread with its back touching the floor. He also testified that his test results would not have been obtained from a person who had, after picking up the 9 millimeter Glock and putting it down, handled the jacket. While he acknowledged that the handling of firearms and ammunition could contribute to the transfer of gunshot residue onto an item, that would not account for the residue on the jacket unless the gun had been banged on the floor to dislodge the particles from inside the barrel.
Defendant does not challenge the legal sufficiency of this evidence. He maintains that he was deprived of a fair trial because the trial court took over the questioning of Lundy by intervening with questions or comments on 30 of the 36 pages spanning her cross-examination, and participated equally with defense counsel in the cross-examination of Schwoeble by intervening on 14 of the 34 pages spanning his testimony. Defendant contends that by virtue of this interference, the court reinforced the experts’ testimony that denim was the type of fabric that did not shed gunshot residue easily and that tin was found both in the 9 millimeter handgun and on defendant’s jacket.
The guarantee of a fair trial does not “inhibit a Trial Judge from assuming an active role in the resolution of the truth” *109 (People v De Jesus, 42 NY2d 519, 523 [1977]). Thus, a trial judge is permitted “to question witnesses to clarify testimony and to facilitate the progress of the trial,” and, if necessary, to develop factual information (People v Yut Wai Tom, 53 NY2d 44, 55, 57 [1981]; see People v Hinton, 31 NY2d 71, 76 [1972], cert denied 410 US 911 [1973]; People v Moore, 6 AD3d 173 [1st Dept 2004], lv denied 3 NY3d 661 [2004]). However, a judge may not “take[ ] on either the function or appearance of an advocate at trial” (People v Arnold, 98 NY2d 63, 67 [2002]).
The “substance and not the number of questions asked is the important consideration” (Yut Wai Tom, 53 NY2d at 58). Even if a trial judge makes intrusive remarks that would better have been left unsaid, or questions witnesses extensively, the defendant is not thereby deprived of a fair trial so long as the jury is “not prevented from arriving at an impartial judgment on the merits” (People v Moulton, 43 NY2d 944, 946 [1978]; People v Abdul-Khaliq, 43 AD3d 700 [1st Dept 2007], lv denied 9 NY3d 989 [2007]). Notably, although the exercise of a trial court’s power to question witnesses should be exercised “sparingly” (Yut Wai Tom, 53 NY2d at 57), “in the case of expert testimony, the court’s intervention is often necessary to assist the jurors in comprehending matters of specialized knowledge” (People v Gonzalez, 228 AD2d 340, 340 [1st Dept 1996], lv denied 88 NY2d 1021 [1996]), and the trial judge is afforded greater leeway.
The record before us establishes that the trial court did not take on the function and appearance of an advocate. Certain of the court’s interventions were attempts to clarify expert testimony. Others, even if ill-advised, may be characterized as light-hearted banter. However, taken as a whole, the court’s interventions during the gun residue experts’ testimony, which occurred on 44 of 70 pages of an almost 2000-page transcript, did not endorse the People’s case and did not infect the jury’s evaluation of that testimony (see People v Jones, 176 AD2d 174, 174 [1st Dept 1991], lv denied 79 NY2d 859 [1992] [rejecting defendant’s largely unpreserved claims of excessive and partisan interference where “examination of the record reveal(ed) that the court’s questions and comments served to clarify otherwise confusing testimony by expert witnesses, to elicit significant facts from the witnesses, and to assist the jurors in comprehending the evidence”]). Nor did the court’s intervention convey to the jury that the court had any personal opinion regarding defendant’s guilt or prevent the jury from arriving at an impartial judgment on the merits (see People v Sample, 45 AD3d 450 [1st *110 Dept 2007], lv denied 10 NY3d 771 [2008]; People v Martinez, 35 AD3d 156 [1st Dept 2006], lv denied 8 NY3d 924 [2007]; People v Melendez, 31 AD3d 186 [1st Dept 2006], lv denied 7 NY3d 927 [2006]; People v Straniero, 17 AD3d 161 [1st Dept 2005], lv denied 5 NY3d 795 [2005]).
Defendant argues that the court’s intervention “diminished” his claim that the residue on his jacket could have been placed there by cross-contamination. However, some of the court’s questions were designed to expedite matters and ensure that the witness understood what was being asked after the prosecutor posed a confusing hypothetical (see People v Gagot, 61 AD3d 461 [1st Dept 2009], lv denied 12 NY3d 853 [2009]). Other questions were designed to ensure that the jury understood the expert’s answers, which often employed technical jargon, and the court did not express skepticism with the defense theory that the residue on defendant’s jacket came either from his being shot at or from a transfer when the jacket was placed on the floor. In other instances, the court intervened where defense counsel was attempting to prevent an expert from providing complete answers or was repeating a portion of testimony that defense counsel appeared not to have heard.
Defendant’s reliance on People v Retamozzo (25 AD3d 73 [1st Dept 2005]), which involved the same trial judge, is misplaced. In Retamozzo, we held that the defendant was denied a fair trial on drug possession charges by the trial court’s repeated questioning of the defendant during his direct testimony and of prosecution witnesses during cross-examination. However, in Retamozzo, the court posed questions that assumed facts that had not yet been testified to in order to bolster the People’s witnesses, repeatedly interrupted the defense cross-examination of the People’s eyewitnesses in order to “devalu[e]” and “denigrare]” the defense, and engaged in extensive questioning of the defendant to attack his credibility (25 AD3d at 76-78). This significant interference, which advocated the prosecution’s case and completely undermined the defense, does not exist here.
Furthermore, although it is true that a “claim that the intrusion of the Trial Judge deprived [the defendant] of his constitutional right to a fair trial is not subject to harmless error analysis” (People v Mees, 47 NY2d 997, 998 [1979]), the strength or weakness of the evidence may be considered as a factor in determining whether the defendant received a fair trial (see e.g. People v Russo, 41 NY2d 1091, 1091-1092 [1977]; People v Broom, 200 AD2d 515 [1st Dept 1994], lv denied 83 *111 NY2d 964 [1994]). As set forth above, the strong identification testimony of Officer Anselmo, which was corroborated by, among other things, other eyewitness testimony, ballistics evidence, DNA evidence linking defendant to the denim jacket, and gunshot residue evidence linking the denim jacket to the 9 millimeter handgun used in the shooting, constituted overwhelming evidence of defendant’s guilt (see People v Corchado, 299 AD2d 843 [4th Dept 2002], lv denied 99 NY2d 581 [2003]).
Lastly, while it is by no means dispositive, the court admonished the jury that
“you are not to consider anything that I may have said during the trial or any questions that I may have asked or any facial expression you may have thought you learned or anything I may say during the very course of this charge as some kind of indicia that I have an opinion on this case one way or the other.
“I have ladies and gentlemen no opinion whatsoever. And I have no power to tell you what the facts are or tell you that this fact was more important than this fact. That this witness was truthful. This witness was accurate. This witness was inaccurate. Etcetera. These are all matters in your exclusive power as the sole exclusive judges of the facts in this case” (see People v Whitecloud, 110 AD3d at 627 [“To the extent that any of the court’s interventions were inappropriate, they were not so egregious as to affect the verdict or deprive defendant of a fair trial, particularly in light of the court’s jury charge” (citation omitted)]).
In light of all of these circumstances, while “[it] is unfortunate that the court could not resist the temptation to take over the examination of [certain] witnesses” and asked “questions that would have been better left for the [attorneys]” (Melendez, 31 AD3d at 197), its comments and questions, even where inappropriate, did not deprive defendant of a fair trial. Although the gunshot residue evidence may have been important, it was not the only evidence that corroborated Officer Anselmo’s eyewitness identification of defendant as the shooter on the driver’s side of the car. There is strong evidence of defendant’s guilt, and the court instructed the jury that its interventions were not intended to convey any opinion or bias, or to endorse the prosecution’s case.
*112 While on occasion the court may find it helpful or even necessary to clarify or expand on a complex issue or subject unfamiliar to jurors, particularly where expert witnesses are involved, we once again caution trial judges against engaging in overly intrusive involvement in the questioning of witnesses, and unduly interfering with the orderly presentation of proof in the trial of a criminal case (see id. at 198).
Defendant failed to preserve his argument that he was deprived of his constitutional rights to due process, to present a defense, and to confront his accusers by various rulings precluding defense counsel from asking certain questions of the forensic examiners on cross-examination, and we decline to review it in the interest of justice. In any event, it is without merit. The challenged rulings were well within the court’s discretion.
Defendant also argues that a Frye hearing should have been held on some of the methodologies described in Schwoeble’s testimony (see Frye v United States, 293 F 1013 [DC Cir 1923]). However, defendant failed to preserve his Frye argument by requesting a hearing at the third trial. In any event, a Frye hearing was not warranted (see People v Hayes, 33 AD3d 403 [1st Dept 2006], lv denied 7 NY3d 902 [2006]). Other challenges raised by defendant go to the weight or credibility of the testimony, not its admissibility.
Defendant’s argument that the court should have precluded the admission of the jacket and gun and testimony about the tin found on them because there were gaps in the chain of custody is not preserved. In any event, it is without merit.
As the People concede, defendant’s sentence must be modified so that the terms imposed on the two first-degree murder counts run concurrently with the terms imposed on the two second-degree murder counts. The term of 15 years on the second-degree weapon possession must run concurrently with the aggregate sentence of life without parole (see People v Parks, 95 NY2d 811 [2000]), which remains unchanged.
Accordingly, the judgment of the Supreme Court, New York County (Edwin Torres, J., at jury trial, sentencing and first resentencing; Daniel P Conviser, J., at second resentencing), rendered July 9, 2003, as amended August 2, 2007 and July 31, 2012, convicting defendant of murder in the first degree (two counts), murder in the second degree (two counts), attempted murder in the second degree, and criminal possession of a weapon in the second and third degrees, and sentencing him to an aggregate term of life without parole, should be modified, on *113 the law, to the extent of directing that all sentences run concurrently, and otherwise affirmed.
Acosta, J.P., Renwick, Saxe and Manzanet-Daniels, JJ., concur.
Judgment, Supreme Court, New York County, rendered July 9, 2003, as amended August 2, 2007 and July 31, 2012, modified, on the law, to the extent of directing that all sentences run concurrently, and otherwise affirmed.

 Anselmo testified before the grand jury that he never lost sight of defendant. After revisiting the scene with two assistant district attorneys, he realized he was wrong. In a letter dated June 5, 2000, the prosecutor advised defense counsel that Anselmo’s grand jury testimony was wrong.